[Civ. No. 24760.   Second Dist., Div. Three.   July 20, 1961.]

ALBERT S. GIVENS, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

J. Paul Madsen for Appellant.

E. D. Yeomans, William E. Still, John H. Gordon and John J. Corrigan for Respondent.

VALLÉE, J.—Appeal by plaintiff from an adverse judgment in an action for damages for personal injuries sustained when the motorcycle he was riding collided with a switch engine at a grade crossing.

The complaint is in two counts: The first alleges negligence; the second, wanton misconduct. At the close of plaintiff's opening argument, the court granted defendant's motion for a directed verdict as to count II.

The first point made is that it was error to grant the motion as to count II. Count II alleges "defendant did wantonly and recklessly run and stop said engine over and upon said crossing and obstructed same" after having caused or permitted the signal device at the crossing to cease operation. On this issue we state the evidence and the inferences which reasonably may be drawn therefrom in the light most favorable to plaintiff-appellant. (*Sweet* v. *Markwart,* 158 Cal.App.2d 700, 705-706 [323 P.2d 192].)

The accident occurred about 8:30 p. m. on October 21, 1959. Plaintiff was driving a motorcycle north on Studebaker Road in Los Angeles County. Studebaker Road, about 30 feet wide, ran north and south, with one lane for traffic moving in each direction. Defendant's railroad, running east and west, crossed Studebaker. A freight train of 13 cars was standing some distance beyond the crossing. The engine had left the train and had passed over the crossing a short time before the accident to drop a car on a "Y" on the other side of the crossing. The engine was traveling back to the train when the accident occurred.

Plaintiff was following an automobile. He was traveling 35 to 45 miles an hour. About 200 feet from the railroad tracks he saw the taillights of the car ahead of him, indicating the brakes were on. He "pulled off to the right" and looked toward the crossing. He saw "everything was clear," pulled back in behind the car, and slowed down. He advanced to about "a length or so" from the car ahead of him. The taillights of the car ahead went off and he assumed it was going to make a left turn. The taillights went on again. Plaintiff pulled off to the right "to miss him." As he did so, he saw another car stopped in front of the car he had been following. At that point he "reached" for his brakes, saw the end of the train, "hit" his brakes, and slid into it.

There was a "No. 8" flasher signaling device, equipped with alternately flashing lights on a crossbar, located south of the tracks and east of the highway to warn northbound highway

traffic of approaching trains. There were four lights on the device. The lenses of the lights were red and were 8⅜ inches wide. The globe in each light was "an 8-volt, 18-watt globe." On the standard holding the flashing lights and above them there was a large sign in the form of an "X" reading "RAIL-ROAD CROSSING" and above the sign there was a bell.

The device operated from three independent track circuits, a separate circuit controlling each side of the crossing and a third circuit controlling the crossing area from 27 feet 6 inches east of the crossing to 31 feet 6 inches west of the crossing. It was designed so that the lights and bells would begin to signal as an approaching train from either direction passed over the track at a point 1,100 feet from the crossing. The signal operates for 55 seconds. If a train does not reach a point within 150 feet of the crossing within that period of time, the signal ceases to operate. The signal reactivates and operates for another 55 seconds when the train passes over the track at a point 150 feet from the crossing. If a train approaching on the east side of the crossing does not reach a point 27 feet 6 inches from the crossing or a train approaching on the west side of the crossing does not reach a point 31 feet 6 inches from the crossing within that period of time, the signal ceases to operate. When trains subsequently pass these points, the signal again activates and continues to operate as long as any wheels of the train are on any of the track between the two points. It continues to operate during switching movements back and forth over the crossing so long as one set of wheels is on that section of track. The signal device was designed and placed so as to enable the train crew on an engine or train approaching the crossing along the track to see whether the lights were flashing. A "R$\boxed{X}$R" warning sign was painted on the surface of Studebaker 420 feet south of the railroad tracks.

There was some evidence that at no time prior to the collision were the warning signals functioning. There was also testimony that neither the whistle nor the bell of the engine was sounded. There was no flagman at the crossing.

■■■ "A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result. (Rest. Torts, § 500 et seq.; Prosser, Torts, pp. 260, 261.) Such a tort has been labeled 'willful negligence,' 'wanton and willful negligence,' 'wanton

and willful misconduct,' and even 'gross negligence.' It is most accurately designated as wanton and reckless misconduct. It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm. [Citations.] Wanton and reckless misconduct is more closely akin to willful misconduct than to negligence, and it has most of the legal consequences of willful misconduct." (*Donnelly* v. *Southern Pacific Co.*, 18 Cal.2d 863, 869 [118 P.2d 465].)

Section 500 of the Restatement of Torts, cited with approval in *Donnelly*, reads: "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him."[1]

Prosser, also cited with approval in *Donnelly*, says: " 'Wantonness,' or 'recklessness,' . . . means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they should follow; but this has sometimes been held not to be indispensable, so long as there is great danger known to the actor or apparent to a reasonable man." (Prosser on Torts [2d ed.], § 33, p. 151.)

---

[1]Comment *g* of section 500 reads: "*Negligence and recklessness contrasted.* Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind."

Applying the principle stated, there was no evidence of wanton and reckless misconduct on the part of defendant or of the train crew. There was no evidence that any one of the train crew intentionally did an act or failed to do an act which it was his duty to do, knowing or having reason to know of facts which would lead a reasonable man to realize that his act or failure to act would make it highly probable that harm would follow. In fact, all the evidence was to the contrary. The head brakeman, who was riding on the front of the moving switch engine, testified he was the one who gave signals to the engineer; the crossing flashers were working; the automatic red crossing bells were operating; they continued to ring until the engine was moved off the crossing; the engine bell was ringing; the engine whistle started to blow about 200 feet from the crossing, blowing ''two longs, a short and a very long''; the engine was traveling about 4 miles an hour as it approached within 50 feet of the crossing; a car northbound on Studebaker was stopped and another almost stopped and there were other ''lights'' behind it; a car southbound on Studebaker was stopped. The engineer testified the flashers and the bell on the signal were working; he saw them working when he was 3 or 4 car lengths from the crossing; the engine bell was ringing; he started whistling from the switch, which was about 250 feet from the crossing; he blew the whistle long and loud because he knew there was heavy traffic at the crossing and he saw an automobile coming; as the signal started going that car stopped and two cars on the other side stopped. The fireman testified that midway between the ''Y'' and the crossing he saw the flasher lights working; as the engine approached the crossing one car was stopped and another was coming up behind it; the screech of brakes distracted him; the engine was going between 3 and 5 miles an hour when the motorcycle hit it. At the time of the accident the conductor was in the caboose and the rear brakeman was making a telephone call to clear the train to the next yard; neither saw the accident.

We hold the court did not err in granting the motion for a directed verdict as to count II. Inasmuch as the motion was properly granted, it was not error to refuse instructions on wanton misconduct, as plaintiff claims.

Plaintiff requested and the court refused to give BAJI 137 on the doctrine of imminent peril. Error is asserted. The doctrine has application only to conduct which follows the unexpected appearance of danger. (*People* v. *Campbell*, 162

Cal.App.2d 776, 782 [329 P.2d 82].) ■ Generally it is error to instruct on imminent peril unless at least two courses of action are available to a party after the danger is perceived. (*Smith* v. *Johe,* 154 Cal.App.2d 508, 511 [316 P.2d 688].) ■ At bar there was no voluntary conduct of plaintiff following the unexpected appearance of danger. On the evidence, he had no choice of conduct within the time he saw the engine and his collision with it. Plaintiff's testimony in this respect is quoted in the margin.[2] The court did not err in refusing the instruction.

■ Plaintiff asserts the court erred in refusing to give an instruction he requested with respect to certain operating rules of defendant. The proffered instruction is quoted in the margin.[3] The subject matter of the instruction was fully covered in instructions given. The jury was instructed concerning the obligations of defendant to warn motorists, the duty of defendant to comply with the regulations of the Public

---

[2] "Q. . . . What did you observe about the car ahead of you, if anything? Did you observe anything about the lights on the car ahead of you, let's say? A. Well, yes; he came off the brakes as he approached this point. Q. What do you mean, 'he came off the brakes'? A. The tail lights went out. Q. All right. A. And as I came up, about the same time I noticed that he was pulling—although he was moving quite slowly and I was still moving a little faster than he was, but he came on the brakes again suddenly, and to avoid a collision then I pulled off to the right and I looked over at him. As I pulled by, the maneuver surprised me, and I looked over my shoulder at him. As I looked up again I noticed this other car that was stopped there in front of him. At that point I reached for my brakes and at the same instant, swinging my head around, I saw the back end of this train and I hit the brakes and I slid into it and I hit it and I went out."

"Q. As you were riding along didn't you observe that his headlights illuminated a certain portion of the pavement in front of his car? A. I didn't take particular cognizance of the fact. I looked at him and I turned around. There was another car. There was the train—bang. Q. That was the first time you had seen the train, right? A. Yes."

[3] "There has been admitted into evidence, and previously read to you, certain operating rules of the defendant railroad company, as follows:

"30. The engine bell must be rung when an engine is about to move and while approaching and passing public crossings at grade and as otherwise prescribed by rule, or by law.

"31. The whistle must be sounded at all places where required by rule or law, or to prevent accidents.

"14 (1) Engine whistle signal must be given when 'approaching public crossings at grade . . . ; to be prolonged or repeated until crossing is reached.'

"805. Employees will warn the highway traffic in event there is danger from any approaching train or engine on any track, so far as their duties will permit.

"If you should find from the evidence that any of the defendants' employees failed to comply with any or all of the operating rules admitted in evidence in the case, you are entitled to consider the same in determining whether due care was exercised.''

Utilities Commission, the duty to warn by bell or whistle, prescribed by section 7604 of the Public Utilities Code (section 7604 was read to the jury at plaintiff's request); that defendant's privilege of the right of way at a crossing was dependent on its giving adequate, timely warnings; and that it was its duty "to exercise reasonable care in the warning and for the safety of travelers on a public street that crosses the tracks of the company."

Plaintiff requested and the court refused to give BAJI 150, defining what is meant by "right of way." Error is asserted. There was no error. The subject was covered by the instruction referred to given at plaintiff's request on the privilege of defendant to cross a roadway and for vehicles to give way subject to defendant's first giving "an adequate, timely and lawful warning of its approach and intention to cross the roadway," and that in the absence of such warning defendant could not claim the right of way. The instruction would have been superfluous.

Plaintiff asserts error in the refusal of the court to give BAJI 54-D relative to the meaning of "scope of authority," and 54-G to the effect that a corporation acts through its employees. There were no issues on these questions. It was assumed and in effect conceded that defendant's employees were acting in the course and scope of their employment. Furthermore, in the pretrial statements of issues for trial, neither party asserted that this was one of the issues.

In a blanket statement plaintiff says the court erred in the exclusion of evidence, merely giving references to the reporter's transcript. He does not tell us what the proposed evidence was. We are not advised of the subject matter involved. He does not point out why the evidence was admissible. No showing is made as to why the errors, if there were any, were prejudicial. No authorities are cited. "Appellant asserts that the trial court erred in respect to various rulings admitting and rejecting evidence. . . . Counsel merely states in each instance that the court erred and follows the statement with a reference to the transcript, leaving us to follow up the reference and thus ascertain the nature of question, objection, and ruling. In a somewhat similar situation we said: 'Such a casual presentation of points, if followed up, would impose upon us a labor which is within the peculiar province of counsel, and which does not come within the range of our duty. We are not called upon to consider points so presented.' " (*Meserve* v. *Smith Brothers*, 56

Cal.App. 683, 686 [206 P. 105].) ▮ "It is the duty of counsel by argument and citation of authority to show in what manner rulings complained of are erroneous. We are not obliged to perform the duty resting on counsel." (*Greenstone* v. *Claretian Theological Seminary,* 173 Cal.App.2d 21, 35 [343 P.2d 161].)

Affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied August 17, 1961, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1961.