[Civ. No. 25265. Second Dist., Div. Two. Apr. 25, 1962.]

JOSEPH PATRICK McDEVITT, Plaintiff and Appellant, v. DAVID LEE WELCH, a Minor, etc., et al., Defendants and Respondents.

James G. Butler for Plaintiff and Appellant.

Crider, Tilson & Ruppé, Robert Brill and Henry E. Kappler for Defendants and Respondents.

WOOD, P. J.—Action for damages resulting from a collision of automobiles on a highway, near La Habra, in Los Angeles County. The first cause of action was based on negligence, and the second cause of action was based on wanton and reckless misconduct. After the evidence had been presented, the defendants made a motion for a directed verdict as to the second cause of action. After the judge announced that the motion was granted, the attorneys stipulated that the formality of submitting a form of verdict to the jury regarding the second cause of action was waived, and that it was not necessary to inform the jury that the judge had directed a verdict as to that cause of action. The issue of negligence and contributory negligence, under the first cause of action, were submitted to the jury. The jury returned a verdict, upon the first cause of action, in favor of defendants. Judgment, upon that verdict and upon the directed verdict, was for the defendants. Plaintiff appeals from the judgment.

Appellant contends that the court erred (1) in granting

the motion for a directed verdict, and (2) in refusing to instruct the jury regarding imminent peril. The collision occurred on First Avenue about one foot north of the intersection of that avenue and Ocean Avenue,—in an area referred to as "open country." First Avenue extends north and south; and Ocean Avenue extends east and west. Each avenue is 20 feet wide and is paved. There is no line on either avenue indicating the center thereof or indicating traffic lanes. First Avenue is a "through highway," and stop signs are at the northeast and southwest corners of the intersection indicating that traffic on Ocean Avenue should stop before entering the intersection.

Ocean Avenue at the intersection, and for a considerable distance on each side of the intersection (east and west), is about 10 feet north of the crest of a hill. First Avenue extends over and across the crest of the hill. The incline of that avenue on each side of the crest of the hill is at such a degree that a person approaching the crest in an automobile cannot see over or beyond the crest until the automobile is practically at the crest. There are "dips" on First Avenue at places north and south of those inclines.

On July 29, 1958, about 6 p. m., plaintiff was driving his Chevrolet automobile south on First Avenue, and the defendant David Welch, 17 years of age, was driving an Oldsmobile north on that avenue. Defendant Pacific Die Casting, a corporation, was the owner of the Oldsmobile.

Plaintiff testified in substance as follows: As he was approaching the intersection (which was at the crest of the hill) he was traveling on the right side of First Avenue at the rate of approximately 30 miles an hour—intending to turn left (east) onto Ocean Avenue. When he held out his hand "to make" the left turn onto Ocean, he noticed that a station wagon (traveling west) on Ocean was pulling up to the stop signal (at the northeast corner of the intersection) and that the driver thereof made a hand signal indicating that he was going to turn south onto First Avenue. Then plaintiff slowed down to practically a halt and started to pull more to the right. When the station wagon started to turn onto First, plaintiff was about 30 feet from it. When the wagon passed plaintiff on First, plaintiff was traveling about 5 miles an hour and was 10 or 15 feet from the intersection. At that moment, when the wagon was passing plaintiff, the Oldsmobile (Welch's automobile) came over the brow of the hill (the crest of the hill on First). When plaintiff first saw the Olds-

mobile it was 25 or 30 feet from him, and was about 10 feet south of Ocean. The Oldsmobile was traveling between 60 and 70 miles an hour. In a split second, the Oldsmobile hit plaintiff's Chevrolet practically "head-on" and pushed it back into the bank (a dirt embankment at the west or right side of First and about 45 feet north of the intersection). The impact occurred about 2 feet north of Ocean and "pretty" close to the center of First. Plaintiff's automobile was at all times, until the time of the impact, to the right of the center of First. When plaintiff saw the Oldsmobile coming over the brow of the hill, he got a little panicky and he was trying to determine quickly which direction the driver of the Oldsmobile would go in order to pass him—whether he would go behind the station wagon or would go toward plaintiff, and he was trying to give the Oldsmobile as much room as he possibly could give. He (plaintiff) was not sure whether he turned his automobile to the left or to the right, but he might have turned a foot or two or might have turned to the right. When he saw the station wagon turn onto First, he started to turn to his right to give the station wagon more room to pass, and then he saw the Oldsmobile coming.

On cross-examination, plaintiff was asked whether he saw the Oldsmobile "prior" to the impact. He replied in the negative. He also said, on cross-examination, that he saw the Oldsmobile travel approximately 50 feet from the time he first saw it until the impact occurred.

In his deposition, plaintiff was asked where his automobile was at the time of the impact. He replied, "About in the middle of the road." Then he was asked whether it would be a fair statement to say that his automobile was partially in both lanes. He replied in the affirmative. At another place in his deposition (about 5 pages later) he said that he moved "to the center of the road" when he was about 100 to 150 feet north of Ocean Avenue.

On cross-examination at the trial, he said that when he saw the Oldsmobile coming at him, it is reasonable to assume that he "pushed the panic button and may have turned either one way or the other."

It was stipulated that Officer Gillian, a highway patrol officer, who made an investigation at the scene of the collision, would testify as follows: When plaintiff's automobile came to rest it was "off the road" on the west side of First Avenue, facing in a northwesterly direction, and the rear end of it was about 45 feet north of the intersection. When the Oldsmobile

came to rest, the left side of it was about 30 feet from the intersection, and it was facing in a westerly direction. In his opinion, the point of impact was 1 foot north of the intersection and 6 feet 11 inches west of the east edge of First Avenue. Skid marks made by the Oldsmobile before the collision were: left front tire, about 60 feet; right front tire, about 56 feet; left rear tire, about 36 feet; right rear tire, about 65 feet. Skid marks made by the Oldsmobile after the collision were: left front tire, about 28 feet; right front tire, about 32 feet; left rear tire, about 37 feet.

Officer Davis, a witness called by plaintiff, testified that, in a conversation with Welch immediately after the collision, Welch said: he was traveling approximately 65 miles an hour; when he was about 150 feet south of Ocean Avenue (i.e., approaching Ocean), he saw plaintiff's automobile which was making a left turn in front of him; he (Welch) applied the brakes but he hit plaintiff's automobile.

Mr. Severy, a witness called by plaintiff, testified as follows: He is a research engineer at the University of California at Los Angeles, and his principal work is research in transportation engineering with respect to automobile collisions. Basing his opinion upon a consideration of the skid marks made by the Oldsmobile, the surface of First Avenue, pictures of the damaged automobiles, and the positions of the automobiles after the collision, he was of the opinion that the minimum speed of the Oldsmobile before skidding was 58 miles an hour, and that its maximum speed at that time was 67 miles an hour.

Officer Willingham, a witness called by defendants, testified: He investigated the collision and made measurements of such things as skid marks and the location of the vehicles. In his opinion, the impact occurred at the point where the skid marks stopped and the brush marks started, and that the point of impact was 1 foot north of the intersection and approximately 6 feet 11 inches west of the east edge of the pavement on First Avenue. At the four corners of the intersection and about 8 feet from the edge of the pavement, there are earth embankments which are approximately 4 feet high. On cross-examination, he said that in his opinion the automobiles collided ''head-on'' and that plaintiff's automobile was turned completely around by the impact; that his opinion as to the point of impact was dependent entirely on the skid marks that he saw; that he did not recall what debris was there or where it was on the pavement.

Defendant Welch testified: The highest speed at which he

traveled, in the mile south of the intersection, was 55 miles an hour. He did not see plaintiff's automobile before the automobiles collided. He saw the top of plaintiff's automobile before the collision. While traveling north on First Avenue and approaching Ocean Avenue, a person cannot see anything past (or north) of Ocean until he is on top of the hill in the middle of the intersection or past the intersection. When he first saw the top of plaintiff's automobile he (Welch) was about 50 or 60 feet away. At that time, "from what he could remember," plaintiff's automobile was directly in front of him and he could not tell whether it was stopped or was moving slowly. He (Welch) was then traveling at the rate of approximately 50 miles an hour, and he applied the brakes. Then the hood of his automobile came up in front of him, and he knew that he was going to hit plaintiff's automobile. Just before the collision he saw an automobile, which appeared to be a station wagon, on Ocean Avenue. After the collision, he noticed that a station wagon was still on Ocean Avenue.

Welch testified further that he had traveled on First Avenue occasionally prior to the collision; he knew that First Avenue crossed Ocean Avenue at or near the top of the hill; the hill was steep; the intersection of First and Ocean was, in effect, a blind intersection, and a driver could not see the intersection until the automobile was on top of the hill; the hills on First near the intersection are steep, and there are steep banks on each side of the road.

Plaintiff requested that the court give an instruction on imminent peril, which instruction was known as Instruction No. 137 of Book of Approved Jury Instructions. The request was refused, and no instruction on that subject was given. The instruction, so requested, was to the effect that a person who, without negligence on his part, is suddenly confronted with peril is not required to use the same judgment that is required of him in the exercise of ordinary care in more deliberate moments; and if he does what appears to him to be the best thing to do, and his manner of action is the same as might have been followed by an ordinarily prudent person under the same circumstances, he does all that the law requires of him.

In *Saari* v. *Leddy*, 167 Cal.App.2d 799 [335 P.2d 128], a judgment of nonsuit was based solely upon the ground that plaintiff was guilty of contributory negligence as a matter of law. On appeal, the judgment was reversed on the ground that the doctrine of imminent peril was applicable—that

whether plaintiff was in a position of imminent peril was a question of fact for the jury. In that case, while plaintiff was driving his automobile on a two-lane highway he saw another automobile (driven by Leddy) about 200 yards away, traveling about 80 miles an hour, and headed for plaintiff. When Leddy's automobile was about 150 feet away, plaintiff started to turn left and escape an accident by crossing the highway and entering a driveway. The collision occurred about 3 feet "over the white line" (on the left or wrong side of the highway—in the direction plaintiff had been traveling). There was evidence that Leddy was intoxicated. The trial court therein concluded that plaintiff was guilty of contributory negligence as a matter of law in attempting to make a left turn across the highway in the path of the oncoming automobile. It was said on appeal (p. 801): "It is true, as defendant contends, that the doctrine of imminent peril is not available to one who, through his own negligence, places himself in a position of danger. . . . However, from the evidence as summarized, one could reasonably infer that, faced with a sudden emergency, plaintiff's action in turning to the left in the opposite lane was an attempt to avoid the danger rather than a negligent act which placed him in danger. The fact that the Leddy car remained on its own side of the road for the last 100 yards it traveled prior to the impact would not preclude the jury from finding that the car was out of control and that plaintiff was in danger anywhere on the highway. Whether or not plaintiff was in a position of imminent peril was a question of fact for the jury."

It was also said therein (p. 802): "Where a person is suddenly placed in imminent peril without having sufficient time to consider all of the circumstances, . . . 'He may use such means of avoiding the danger as would appeal to a person of ordinary prudence in a like situation, without being held to a strict accountability as to whether the course chosen by him was the most judicious one.' [Citation.] Or, as our courts have held: ' ". . . he is excusable for omitting some precautions, or making an unwise choice, under this disturbing influence, although if his mind had been clear, he ought to have done otherwise. . . ." ' "

It was also said therein (p. 802): "[I]f the jury could reasonably have drawn the inference (and we conclude it could) that when plaintiff turned left in front of the oncoming car, he omitted some precautions, made an unwise choice, or in bewilderment ran directly into the approaching

danger of the Leddy car, and that such choice was made under the stress and confusion caused by the negligence of Leddy, then such circumstances would preclude a nonsuit, since he could not be held contributorily negligent as a matter of law.''

In the present case there was evidence that the defendant Welch, in approaching and crossing the intersection which was beyond the crest of a steep hill on a comparatively narrow road, was driving at a rate of 60 to 70 miles an hour. There was evidence that plaintiff, in approaching the intersection from the opposite direction, was driving at the rate of approximately 5 miles an hour when he was about 30 feet from the intersection—at the time the station wagon was turning left from Ocean onto First; and that when the station wagon was passing (or meeting) plaintiff about 15 feet from the intersection, Welch's automobile came over the hill. From the evidence herein, the jury could reasonably have inferred that plaintiff was confronted suddenly with imminent peril. Plaintiff was entitled to have the jury instructed as to the law pertaining to his theory of the case, if there was substantial evidence in support of his theory.

In considering whether an instruction regarding imminent peril should have been given, a question arises as to whether, under plaintiff's theory of the case, there was evidence from which the jury could reasonably have inferred that plaintiff was without negligence on his part when he was confronted with the emergency. Defendants (respondents) assert in effect that there was no evidence that plaintiff turned to the left after he first saw Welch's automobile, and therefore, in view of the evidence that the point of impact was on the east side (or wrong side of the road for plaintiff), the only reasonable conclusion to be drawn from the evidence is that plaintiff's automobile was on the wrong side of the road when he first saw Welch's automobile and that plaintiff was negligent. According to plaintiff's theory of the case, he was on the right or west side of the 20-foot-wide First Avenue, and was attempting to give more room to the left-turning station wagon, when he first saw Welch's automobile coming over the hill and toward him at said high rate of speed. At the trial he testified that his automobile at all times, until the time of impact, was to the right of the center of First Avenue; that he got panicky when he saw Welch's automobile coming over the hill, and coming at him, and he was not sure whether he turned his automobile to the left or right but he might have turned left a foot or two or he might have turned to the right.

It does appear that, on cross-examination and in his deposition, he made inconsistent statements with reference to seeing Welch's automobile and with reference to the location of his own automobile. On cross-examination, he was asked whether he saw Welch's automobile "prior" to the impact, he replied in the negative. Later, however, he said that the automobile traveled about 50 feet from the time he first saw it until the impact occurred. Since the word "prior" was used in the first question so referred to, and since a specified distance was stated in the second question with reference to seeing the automobile, the trier of facts, in resolving the conflicting statements, could reasonably assume that plaintiff misunderstood the word "prior." In his deposition, plaintiff said that at the time of the impact his automobile was partially in both lanes. It is to be noted that that statement, which related to the *time of the impact*, would not necessarily mean that his automobile was partially in both lanes when he first saw Welch's automobile. With reference to the statement in the deposition that he moved to the center of the road when he was about 150 feet north of Ocean, it is to be noted that the statement does not necessarily mean that he moved beyond the center of the road. The trier of the facts could reasonably infer therefrom that he moved the automobile near the center. The evidence, submitted by defendants, to the effect that the impact occurred on the east or wrong side of the road was opinion evidence of two officers, which opinions were based upon the skid marks, and appearance and locations of the automobiles. Their opinions were that the "point of impact" was approximately "6 feet 11 inches" west of the east edge of the pavement on First Avenue. It is to be noted that they did not expressly state that the impact occurred east of the center of the road—it is only by a mathematical calculation that it can be ascertained that their opinions meant that the impact occurred on the east side of the road. Presumably it was contemplated that the calculation should be as follows: Since the road was 20 feet wide, the center of the road would be 10 feet from the east edge of the pavement; and since the "point" of impact was 6 feet 11 inches from the east edge of the pavement, the said point of impact would be 3 feet 1 inch each of the center. As above stated, there was no marked line indicating the center of the road. It is difficult to understand how the "point" of impact could be determined precisely to the "inch" when the width of each colliding object was more than 6 feet wide and the objects collided practically

head-on. One officer said he did not recall what debris was there or where it was on the pavement. The stipulation as to the testimony of the other officer did not refer to debris. In any event, the evidence presented questions of fact as to where plaintiff's automobile was when plaintiff first saw Welch's automobile, which way plaintiff's automobile moved after plaintiff first saw the other automobile, and where the impact occurred. Under plaintiff's theory of the case, the question as to imminent peril was one of fact. The court erred in refusing to instruct the jury regarding the doctrine of imminent peril.

A further contention of appellant is that the court erred in granting defendants' motion for a directed verdict as to the second cause of action, which cause was based on wanton and reckless misconduct of Welch in driving the Oldsmobile.

The rules with respect to directing a verdict are the same as the rules with respect to granting a nonsuit. (*Merlino* v. *Southern Pac. Co.*, 132 Cal.App.2d 58, 59 [281 P.2d 583].) A verdict for defendant may be directed only when there is no evidence of sufficient substantiality to support a verdict for plaintiff; and in determining a motion for such a verdict the evidence is to be considered in the light most favorable to plaintiff. (*Sweet* v. *Markwart,* 158 Cal.App.2d 700, 705-706 [323 P.2d 192].) ''The law also recognizes a type of misconduct which is more culpable than negligence, yet falls short of intentional wrong. The Torts Restatement (§§ 500, 282) characterizes this as 'reckless disregard of the safety of another'; its usual designation is 'wanton' or 'wilful misconduct.' '' (Witkin, Summary of California Law, p. 1412, § 220.) ''To constitute 'wilful misconduct' there must be actual knowledge, or that which in the law is esteemed to be the equivalent of actual knowledge, of the peril to be apprehended from the failure to act, coupled with a conscious failure to act to the end of averting injury. [Citation.] To this must be added the element . . . of actual knowledge or its equivalent that an injury . . . will be a probable result.'' (*Porter* v. *Hofman,* 12 Cal.2d 445, 448 [85 P.2d 447].) Wanton and reckless misconduct occurs when a person, with no intent to cause harm, intentionally performs an act which is so unreasonable and dangerous that he knows, or should know, that it is highly probable that harm will result. (*Donnelly* v. *Southern Pac. Co.*, 18 Cal.2d 863, 869 [118 P.2d 465].)

In *Givens* v. *Southern Pac. Co.*, 194 Cal.App.2d 39, 44

[14 Cal.Rptr. 736], it was said: "Prosser, also cited with approval in *Donnelly,* says: ' "Wantonness," or "recklessness," means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they should follow; but this has sometimes been held not to be indispensable, so long as there is great danger known to the actor or apparent to a reasonable man.' (Prosser on Torts [2d ed.], § 33, p. 151.)"

 Some of the evidence, viewed in the light most favorable to plaintiff, was as follows: Defendant Welch was driving on a narrow road where there were steep hills and steep embankments at the sides of the road. There was no line indicating the center of the road. In the direction which Welch was traveling, the blind intersection of First and Ocean was about 10 feet beyond the crest of a steep hill. A person approaching the crest of that hill from either direction cannot see over or beyond the crest until the automobile is practically at the crest. The side of the hill on which Welch was approaching the intersection was of such a degree of steepness that, when his automobile was about at the crest, the hood of his automobile "came up in front" of him,—i.e., the hill was so steep that the inclining position of the automobile hood prevented him from seeing the road ahead. Welch had traveled that road on previous occasions. On this occasion he drove over the crest and across the intersection at the rate of 70 miles an hour. His automobile made skid marks 88 feet in length—28 feet of which were made after striking plaintiff's automobile head-on. Plaintiff's automobile was knocked completely around, off the pavement on the west side of the road, and against a dirt embankment about 45 feet northwest of the intersection.

The evidence was sufficient to present a question of fact for the jury on the issue of wanton and reckless misconduct. The court erred in granting the motion for a directed verdict as to the second cause of action.

The judgment is reversed.

Fourt, J., and Lillie, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 20, 1962.