[Civ. No. 24595. Fourth Dist., Div. One. Oct. 28, 1983.]

MADONNA CANAVIN et al., Plaintiffs and Appellants, v.
PACIFIC SOUTHWEST AIRLINES, Defendant and Respondent.

514

516

**COUNSEL**

Good & Novack and Ned Good for Plaintiffs and Appellants.

Kern, Wooley, Maloney, Kern & Wooley and Ralph S. LaMontagne, Jr., for Defendant and Respondent.

## OPINION

**WORK, J.**—Madonna Canavin, individually and as guardian ad litem for her three children, appeals the $750,000 lump-sum jury judgment in a wrongful death action against Pacific Southwest Airlines (PSA) after a plane crash killed Joseph Reed Canavin, her husband and their father. She contends the trial court erred in: (1) not instructing the jury to award damages for grief and sorrow; (2) improperly considering decedent's income taxes in determining future pecuniary losses; (3) excluding relevant evidence so as to deprive them of a fair trial; (4) improperly denying prejudgment interest; (5) failing to acquire individual jury verdicts for each heir; and (6) engaging in other misconduct.

The doctrine of stare decisis and the state of the pleadings in this case force us to conclude the trial court properly refused to instruct on grief and sorrow. We redetermine a portion of our decision in *Fox* v. *Southwest Airlines* (1982) 133 Cal.App.3d 565 [184 Cal.Rptr. 87], and hold the Canavins are entitled to prejudgment interest on that portion of the award representing their economic loss before the date of judgment. We hold the jury returning a single, unallocated lump-sum verdict representing the total of the awards for each beneficiary as directed by statute does not deny the individual claimants their rights to jury trial. However, we recommend trial courts require juries to answer special interrogatories stating the amounts they include to compensate each individual claimant, to assist in final apportionment of the award. Reversal is mandated because the trial court allowed the jury to consider evidence of both decedent's gross and net future earnings and to consider present-value discount rates derived from both taxable and nontaxable investments, without providing instructional guidelines. This permitted the jury to use after-tax earnings in computing total lost future support, and reduce that total to present value by the higher discount rate established through use of taxable investments, without any corresponding increase in the award to offset the taxes to be incurred on the investment income.

### Factual and Procedural Background

Dr. Joseph Canavin, age 33, died in a PSA aircrash September 25, 1978, in San Diego. He was a brilliant dynamics engineer with a national reputation in the research field of dynamics and control of large flexible space

satellites and a member of the advanced systems department at Draper Laboratories in Massachusetts, working on classified matters of national significance. He is survived by his wife and three young children.

The Canavins were married in 1969, and maintained a strong familial unit. Decedent was a loving, caring and devoted husband and a proud, considerate, conscientious and active father who, at age 32, was recognized for his contributions in structural dynamics and was the leading authority in his specialty. After graduating from Case Institute of Technology in 1967, he received his masters and Ph.D. from U.C.L.A. From mid-1976 his research included control of the vibration of large space craft, such as satellite shuttles and missiles, and he assisted the government in evaluating contractors' proposals and monitoring their progress. His salary at death was approximately $32,000 a year, plus fringe benefits.

PSA conceded liability and the matter was tried solely on damages, the jury returning an unapportioned verdict for all heirs in the sum of $750,000. A motion for additur was denied.

■ I. THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT THE JURY TO AWARD DAMAGES FOR GRIEF AND SORROW

In contending the trial court erred by not instructing the jury grief and sorrow is a proper element of damages in a wrongful death action, the Canavins ask us to reverse a " 'judicially created' misinterpretation of a statute that is medieval, unjust, and out-of-touch with 20th century reality." However, as an intermediate appellate court, the doctrine of stare decisis compels us to deny the request. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 72 [137 Cal.Rptr. 863, 562 P.2d 1022], our Supreme Court stated: "California cases have uniformly held that damages for mental and emotional distress, including grief and sorrow, are not recoverable in a wrongful death action." Relying on *Parsons* v. *Easton* (1921) 184 Cal. 764, 770 [195 P. 419], *Bond* v. *United Railroads* (1911) 159 Cal. 270, 285-286 [113 P. 366], *Dickinson* v. *Southern Pacific Co.* (1916) 172 Cal. 727, 731 [158 P. 183], and *Munro* v. *Dredging etc. Co.* (1890) 84 Cal. 515, 525 [24 P. 303] (*Krouse* v. *Graham, supra,* at pp. 69, 72-73), the court in *Krouse* expressly found reversible error where inconsistent and confusing instructions regarding wrongful death damages were given and a sizable plaintiff's verdict was rendered which "may very well have included a substantial award for their grief and suffering . . . ." (*Id.,* at pp. 72-73.)

The Canavins ask us to ignore this case precedent under the rationale of *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr.

831, 616 P.2d 813], recognizing rapid developments in the tort of negligent infliction of emotional distress governed by the basic principles of foreseeability and no longer shackled by the requirement of physical injury, and holding damages for emotional injuries are now independent and nonparasitic in character. Preliminarily, *Molien* and its progeny (e.g., *Sesma* v. *Cueto* (1982) 129 Cal.App.3d 108 [181 Cal.Rptr. 12]) are inapposite, because the Canavins neither pleaded an independent cause of action for personal injury based upon emotional distress arising from PSA's negligent killing of decedent, nor alleged they had suffered any damage as a result of grief and sorrow. Neither did they offer to amend their pleadings to state an action for emotional distress.[1]

More basically, *Molien* is inapposite because emotional injuries to the heirs are not relevant to a cause of action for wrongful death. "Rather, the measure of damages [in a wrongful death action] is the value of the benefits the heirs could reasonably expect to receive from the deceased if [he or] she had lived [citations]." (*Allen* v. *Toledo* (1980) 109 Cal.App.3d 415, 423 [167 Cal.Rptr. 270]; *Morales* v. *Superior Court* (1979) 99 Cal.App.3d 283, 287-288 [160 Cal.Rptr. 194]; *Mize* v. *Atchison T. & S.F. Ry. Co.* (1975) 46 Cal.App.3d 436, 453 [120 Cal.Rptr. 787]; *Syah* v. *Johnson* (1966) 247 Cal.App.2d 534, 546 [55 Cal.Rptr. 741]; *Cervantes* v. *Maco Gas Co.* (1960) 177 Cal.App.2d 246, 251 [2 Cal.Rptr. 75].) In other words, "[i]t is the probable value of the decedent's life to those for whom the action is brought . . . ." (66 Cal.Jur.3d, Wrongful Death, § 29, p. 57.) It does not include the value of the independent, nonderivative effects of the loss of the decedent upon the heirs. This is evident from reviewing those elements of damages recoverable in a wrongful death action, such as the value of the loss of household services, earning capacity, society, comfort, care, protection, solace and consortium. (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 67-70.) Our Supreme Court has "repeatedly declared in [its] decisions, the loss of comfort and society are to be considered only 'with reference to the value of the life of the deceased and the pecuniary loss to the plaintiff caused by the death.' " (*Dickinson* v. *Southern Pacific Co., supra,* 172 Cal. 727, 731.)

 II. Although the Trial Court Did Not Prejudicially Err in Admitting Evidence of Decedent's After-tax Earnings, It Did So in Refusing to Instruct the Jury on Applicable Discount Rates

Where, as here, decedent was a husband and father, a significant element of damages is the loss of financial benefits he was contributing to his family

---

[1]For an example of a complaint alleging separate causes of action for wrongful death and emotional distress, see *Sesma* v. *Cueto, supra,* 129 Cal.App.3d 108.

by way of support at the time of his death and that support reasonably expected in the future. (*Benwell* v. *Dean* (1967) 249 Cal.App.2d 345, 349 [57 Cal.Rptr. 394]; Code Civ. Proc., § 377.) The total future lost support must be reduced by appropriate formula to a present lump sum which, when invested to yield the highest rate of return consistent with reasonable security, will pay the equivalent of lost future benefits at the times, in the amounts and for the period such future benefits would have been received. (BAJI No. 14.70.) Since the present award is to compensate for support which would only have been received in the future had decedent survived, discounting to present value recognizes the economic advantage of receiving a present lump sum which may be used or invested as speculatively or conservatively as the recipient chooses. Since the purpose is to attempt to provide the amounts of future support which the beneficiaries would have received in the future had decedent lived, and to provide them as nearly as possible within the time frames they would have been received, California courts have established the general rule expressed in BAJI. Exact actuarial computation should result in a lump-sum, present-value award which if prudently invested will provide the beneficiaries with an investment return allowing them to regularly withdraw matching support money so that, by reinvesting the surplus earnings during the earlier years of the expected support period, they may maintain the anticipated future support level throughout the period and, upon the last withdrawal, have depleted both principal and interest. (Speiser, Recovery for Wrongful Death, Economic Handbook (2d ed. 1979) (1982) cum. supp. § 3:2, pp. 16-17.)

Both the Canavins and PSA presented expert testimony to assist the jury in determining the proper present value factor to include in its total award. There were no significant differences in the formula each party gave the jury to measure the family's total future lost support. Each factored in decedent's age and death, his work-life expectancy, his annual income and fringes at death, a projected earnings growth rate for his expected work life, the present and future rate of decedent's personal earning consumption and the age and life expectancy of each beneficiary. Although there was considerable dispute over the appropriate value to be given each factor in the formula, the major controversy on this appeal is that given to decedent's annualized income. The Canavins claim the multiples in the formula should be applied to the gross earnings; PSA contends the figure should be the net spendable (take-home) pay. The trial court took no position, permitting PSA to introduce evidence of decedent's after-tax, take-home pay and to argue it represented the true net spendable income from which the beneficiaries past and future loss of support should be computed.[2] At the same time, the

---

[2] This conforms to what one authority refers to as the "established practice" of California courts (in personal injury cases) to prevent plaintiffs from being reimbursed for more than their actual loss. (Johns, California Damages (2d ed. 1977) § 1.79, p. 90.)

Canavins were permitted to introduce evidence of, and attempt to persuade the jury to evaluate, future lost support by using decedent's gross earnings, without regard to income tax liability. The trial court did not take sides, it gave no instructions to assist the jurors in selecting one approach rather than the other. Its "hands off" attitude was consistently followed when it allowed the Canavins to urge a present value discount factor based upon the lower interest rates generated by tax-free investments and permitted PSA to argue for the application of a higher discount rate derived from taxable long-term investments generating future tax liabilities to the beneficiaries on the interest earned.

There was no direct evidence of projected future income tax consequences on the issues of: (1) future pecuniary loss of support, (2) the earnings generated by investing the award, or (3) the statutory nontaxability of the judgment itself. This avoided concerns expressed in reported decisions rejecting such evidence on the ground it is too speculative or complicated for jurors to comprehend, or raises too many collateral issues to permit a fair and expeditious trial. (See *Rodriguez* v. *McDonald Douglas Corporation* (1978) 87 Cal.App.3d 626, 667 [151 Cal.Rptr. 399].) Because the use of after-tax, take-home pay as a base from which to determine loss of future income takes into account decedent's future income tax liability, the jury here was not called upon to choose between conflicting theories of future tax rates or speculate about what actual percentage of decedent's future income would have been available to support his family. Even so, the Canavins claim they have been prejudiced by PSA introducing evidence of decedent's net earnings after taxes.

For reasons expressed in the concurring opinion, a majority of this panel believe it is error to compute a survivor's lost support based upon the decedent's projected net income which would have been available for support except for the wrongful death.[3] However, even if such conduct constitutes error, it is not reversible per se, but mandates reversal only where it is reasonably probable a result more favorable to the appealing party would have been obtained in the absence of the error. Here, the Canavins do not allege, and the record does not show, any prejudice emanating solely from the evidence of after-tax (net) income. The prejudice in this record arose only because the trial court refused to instruct the jurors to use the lower discount rate of an appropriate tax-free investment when reducing the award to present value *if* they based their computation of lost future support on projected net earnings. Indeed, plaintiffs assert on this appeal, giving this curative instruction would have resulted in consistency and fairness.

---

[3] I disagree, see my dissenting opinion to Justice Staniforth's concurring opinion.

The use of a tax-free rate discount when relying upon net after-tax income in arriving at lost future earnings approximates the result obtained by using decedent's net income, applying a discount rate based upon a taxable investment and increasing the lump-sum award proportionately to offset the amount of income tax payable on the future earnings generated from investing the award. (See Fitzgerald, *Economic Loss in Wrongful Death: Principles of Evaluation* (July 1977) 44 Insurance Counsel J. 427, 432; see also *DeLucca* v. *United States* (9th Cir. 1982) 670 F.2d 843, 846.) The technique eliminates jurors having to weigh and analyze contradictory evidence and having to speculate on future income tax rates.

Here the trial court admitted evidence of both decedent's gross income and his net income after taxes *and* evidence of interest rates on discount rates derived from both long-term taxable government bonds (12¼ percent) and on shorter term, more flexible tax-free government bonds (8 percent). The lower the discount rate applied, the greater the total lump-sum award after reduction to present value. (Johns, California Damages, *supra,* § 1.87(b), p. 96.) Understandably, PSA strenuously urged the jurors to adopt the discount rate applicable to 12¼ percent, long-term government bonds, while the Canavins vigorously exhorted them to use the lower rate.

Recognizing the likelihood the jury logically could compute the family members' lost support by using decedent's net spendable take-home pay and, at the same time accept PSA's argument the 12¼ percent government bond availability made it the most reasonably secure investment for the lump-sum award, the Canavins asked the trial court to instruct the jurors, should they choose to base their computation on after-tax net income: "Regarding present cash values, when considering the subject of deceased's spendable income or take-home pay rather than his gross salary, you should consider as the discount rate the interest on tax-free bonds."[4] The trial court erroneously denied the request and, in fact, gave no legal guidance at all to the jurors on this critically material point.[5]

Refusal to give a requested instruction is reversible error where the omission misleads and confuses the jury and it is reasonably probable a result more favorable to the requesting party would have been reached in

---

[4]To offset any potential double tax windfall to themselves, the Canavins also asked the jurors be instructed to use a discount rate from taxable investments if it used, as a beginning point, decedent's gross salary. This instruction was also refused.

[5]However, when reducing to present value the remaining, non-monetary support elements of the total pecuniary loss, including loss of society, comfort and protection (Johns, California Damages, *supra,* § 1.86, p. 95), the jury, if it relied on net income after taxes and properly applied the lower discount rate based on tax-free investments, should independently determine the proper discount rate to apply to the award for damages not related to lost support.

the absence of the error. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 951 [160 Cal.Rptr. 141, 603 P.2d 58]; *Williams* v. *E. W. Robinson Van Lines* (1956) 46 Cal.2d 14, 15-18 [291 P.2d 453]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 320, p. 4299.) ■ Here, the trial court prejudicially erred in refusing to give the proffered instruction, because the uninstructed jury may have accepted PSA's analytical invitation to rely simultaneously on the net income after taxes and the more than 50 percent greater discount rate based upon the taxable bond interest. This would deny the Canavins full measure of their award because it is subjected to double taxation, the first occurring when take-home pay was used, rather than gross, and the second when the higher discount on taxable bonds was applied to the total loss of future earnings based upon that take-home income. It cannot be presumed the jury did not in fact "double tax" the Canavins' award in the absence of proper instructions on the controlling legal and economic principles to provide it with a full and complete understanding of the intricate economic issues before it. (See *Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 482 [71 P.2d 220]; *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 157-158 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Thomas* v. *Buttress & McClellan, Inc.* (1956) 141 Cal.App.2d 812, 819-820 [297 P.2d 768].)

■ III. THE TRIAL COURT ERRED IN DENYING PREJUDGMENT INTEREST FOR PAST ECONOMIC LOSSES

Relying on Civil Code[6] sections 3287 and 3288 and Code of Civil Procedure section 377, the Canavins asked prejudgment interest on the total verdict sum from the date of death to trial on both their economic and noneconomic losses. ■ Since section 3287, subdivision (a) applies to situations "where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage" (*Esgro Central, Inc.* v. *General Ins. Co. of America, Inc.* (1971) 20 Cal.App.3d 1054, 1060 [98 Cal.Rptr. 153]) and because there was considerable dispute between the parties concerning the relevant elements by which to compute damages, rendering them not reasonably susceptible to ready and certain calculation, prejudgment interest may not be awarded under section 3287, subdivision (a) (*In re Pago-Pago Air Crash of January 30, 1974* (C.D.Cal. 1981) 525 F.Supp. 1007, 1011-1012).

On the other hand, section 3288 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." ■ "[A] party does not have to prove both a breach of a noncontractual obli-

---

[6]All statutory references are to the Civil Code unless otherwise specified.

gation *and* oppression, fraud or malice." (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642]; compare, *id.* at p. 814, fn. 17 with *Southern Pacific Transportation Co.* v. *State of California* (1981) 115 Cal.App.3d 116, 122 [171 Cal.Rptr. 187].) The provision "permits discretionary prejudgment interest for unliquidated tort claims." (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles* (1979) 26 Cal.3d 86, 102 [160 Cal.Rptr. 733, 603 P.2d 1329].) In other words, "[e]ven if plaintiff's damages are not liquidated, prejudgment interest may be awarded." (*Bullis, supra,* 21 Cal.3d 801, 814.) "The award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss." (*Greater Westchester, supra,* 26 Cal.3d 86, 102-103; *Curtis* v. *State of California* (1982) 128 Cal.App.3d 668, 686 [180 Cal.Rptr. 843].)

PSA correctly cites our decision in *Fox* v. *Pacific Southwest Airlines, supra,* 133 Cal.App.3d 565, 572-574, as rejecting this identical contention. We take this opportunity to review the persuasiveness of our reasoning on this issue within that decision. In *Fox,* we relied on *Greater Westchester, supra,* 26 Cal.3d 86, where the Supreme Court reversed an improper award of prejudgment interest under section 3288 for personal injuries and emotional distress inflicted by airport noise under a nuisance claim. After reviewing the nature of an interest award, the Supreme Court reasoned: "Using recognized and established techniques a fact finder can usually compute with fair accuracy the interest on a specific sum of money, or on property subject to specific valuation. Furthermore, the date of loss of the property is usually ascertainable, thus permitting an accurate interest computation. [Citation.]

"However, damages for the *intangible, noneconomic aspects of mental and emotional injury* are of a different nature. They are inherently nonpecuniary, unliquidated and not readily subject to precise calculation. The amount of such damages is necessarily left to the subjective discretion of the trier of fact. Retroactive interest on such damages adds uncertain conjecture to speculation. Moreover where, as here, the injury was of a continuing nature, it is particularly difficult to determine when any particular increment of intangible loss arose. Acknowledging the problem, the trial court arbitrarily resorted to an 'averaging' method applied to both the amount and duration of the loss. In our view this process was impermissibly speculative.

"Furthermore, a fact finder in assessing a claim of general damages for physical, mental and emotional suffering, possesses full authority to consider the duration of the alleged suffering. Accordingly, the *disallowance of any interest on such a claim does not deprive the claimant of compensation*

*for an element of actual damage.* To the contrary, its allowance, in fact, may in a given case create a double recovery.

"For the foregoing reasons, some respected commentators have disapproved the allowance of prejudgment interest on a claim of general damages for suffering." (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d 86, 103; italics added.) In *Fox,* after quoting a substantial portion of the cited text from *Greater Westchester,* we rationalized our holding as follows: "Thus, *Greater Westchester* confirms the purpose of prejudgment interest is to compensate a party for lost *property.* (See also *Big Bear Properties, Inc.* v. *Gherman* (1979) 95 Cal.App.3d 908, 914 [157 Cal.Rptr. 443].) Absent oppression, fraud, or malice, prejudgment interest should not be awarded in a wrongful death action. (*Southern Pac. Transportation Co.* v. *State of California* (1981) 115 Cal.App.3d 116, 122 [171 Cal.Rptr. 187].) This rule is appropriate because wrongful death damages neither involve lost property nor are they readily ascertainable without a judicial determination based upon conflicting evidence. (See *Levy-Zentner Co.* v. *Southern Pacific Transportation Co.* (1977) 74 Cal.App.3d 762, 795-799 [142 Cal.Rptr. 1] [applying § 3287, subd. (a), in property damage tort case]; cf. *Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060-1063 [98 Cal.Rptr. 153] [construing section 3287 in a contract context].)" (*Fox* v. *Pacific Southwest Airlines, supra,* 133 Cal.App.3d 565, 573, 574.)

On reflection, our blanket reliance on *Greater Westchester* in *Fox* was overbroad. ■■■ The policy underlying an award of prejudgment interest under section 3288 is to fully compensate the injured party. (*In re Pago-Pago Air Crash of January 30, 1974, supra,* 525 F.Supp. 1007, 1013; §§ 3300 and 3333.) Sometimes an award of prejudgment interest is a necessary element of compensatory damages to insure a plaintiff is made whole. (*Pago-Pago, supra,* at pp. 1013-1014; *Nordahl* v. *Dept. of Real Estate* (1975) 48 Cal.App.3d 657, 665 [121 Cal.Rptr. 794].) "That result can be achieved only if the plaintiff is placed in the position he would have been in had he been compensated for his injuries at the time the injuries were incurred. An individual who must litigate to recover damages should be placed in the same position, when he recovers, as the individual who recovered the day he suffered an injury. Otherwise, the tortfeasor benefits from denying liability and continuing to litigate, while he retains the use of money to which the plaintiff is entitled, and the plaintiff is deprived of the benefit he should have derived from an immediate recovery. As the California Supreme Court . . . explained, '[t]he award of such interest represents the accretion of wealth which money or particular property could have produced during a period of loss.' *Greater Westchester,* 26 Cal.3d at 102-03 . . . . Such an award is all the more necessary in a group of cases such

as the instant ones, where the complexity of the proceedings and the positions of the parties has so long kept the plaintiffs' rightful recovery in the defendant's bank account." (*In re Pago-Pago Air Crash of January 30, 1974, supra,* 525 F.Supp. 1007, 1014.)

Under the statutory cause of action for wrongful death, "damages may be given as under all the circumstances of the case, may be just . . . ." (Code Civ. Proc., § 377.) ■ Recovery for wrongful death is not restricted to only elements of an ascertainable economic value, such as loss of household services or earning capacity, but also includes the monetary value of such factors as lost comfort, society, companionship, care and protection. (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 67-69; *Allen* v. *Toledo, supra,* 109 Cal.App.3d 415, 423; *Carr* v. *Pacific Tel. Co.* (1972) 26 Cal.App.3d 537, 545 [103 Cal.Rptr. 120].) *Greater Westchester* permits no award of prejudgment interest on the inherently nonpecuniary damages for mental and emotional injury. ■ The amount of damages awarded in a wrongful death case designed to compensate these noneconomic losses are akin to those awarded for pain and suffering and emotional distress in *Greater Westchester* and do not support prejudgment interest. (*In re Pago-Pago Air Crash of January 30, 1974, supra,* 525 F.Supp. 1007, 1018-1019; see also *Berns* v. *Pan American World Airways, Inc.* (9th Cir. 1982) 667 F.2d 826, 830.) However, plaintiffs are entitled to prejudgment interest on those damages attributable to an ascertainable economic value, such as loss of household services or earning capacity, as well as funeral and related expenses. "[I]t is important to underscore that [an] award is invalid only to the extent it represents interest on 'the intangible noneconomic aspects of mental and emotional injury' claimed by plaintiffs. [Citation.] If plaintiffs allege specific damage that is supported by tangible evidence, prejudgment interest may properly be awarded under Civil Code section 3288." (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles, supra,* 26 Cal.3d 86, conc. opn. of Chief Justice Bird, 26 Cal.3d 86, 104, 108; see Comment, *The Availability of Prejudgment Interest in Personal Injury and Wrongful Death Cases* (1982) 16 U.S.F. L.Rev. 325, 335-336.)[7]

---

[7]We conclude this court erred in stating: "[a]bsent oppression, fraud, or malice, prejudgment interest should not be awarded in wrongful death actions" relying on *Southern Pacific Transportation Co.* v. *State of California, supra,* 115 Cal.App.3d 116, 122, in *Fox* v. *Pacific Southwest Airlines, supra,* 133 Cal.App.3d 565, 573. (See *Southern Pacific, supra,* at p. 122, *Bullis* v. *Security Pac. Nat. Bank, supra,* 21 Cal.3d 801, 814, and fn. 17, and §§ 3288 and 3294.) In addition, we erroneously stated "[t]his rule is appropriate because wrongful death damages neither involve lost property nor are they readily ascertainable without a judicial determination based upon conflicting evidence." (*Fox, supra,* 133 Cal.App.3d at p. 573.) Funeral and related expenses are fixed. Loss of household services as well as earning capacity constitute damage elements which have an ascertainable economic value. (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 68.) Further, "[p]rejudgment interest under section 3288 is discretionary . . . because, as under section 3287 [subd. (b)], each case requires a determination as to whether interest is necessary to make the plaintiff

Although all wrongful death damages except funeral and related expenses are prospective in character—measured according to each heir's reasonable expectation of benefit determined as of the date of decedent's death (Cal. Attorneys Damages Guide, (Cont.Ed.Bar 1974) Appendix: Wrongful Death, § 109, p. 329), the bulk of damages representing matters of ascertainable economic value in a wrongful death action are principally based on the loss of future contributions computed from estimated future earnings or services of a decedent. As of the date of trial, these damages are divided into two distinct and independent awards, representing past economic loss from the date of death to the date of verdict and future economic loss from the date of verdict. As to the former, "to the extent that plaintiffs recover for earnings lost in the period from the date of the accident to the date of the verdict, they have been deprived of 'the accretion of wealth [that those earnings] could have produced' from the time those earnings would have accrued from the time of the verdict. [Citations.] Interest on these interim earnings from the time that they would have been earned to the time of the verdict is, therefore, necessary to compensate the plaintiffs fully for their injuries." (*In re Pago-Pago, supra,* 525 F.Supp. 1007, 1016; see Note, *Prejudgment Interest: An Element of Full Compensation In Wrongful Death Cases* (1981) U.Ill.L.Rev. 453, 482-483.) However, concerning the latter, plaintiffs are entitled to the present value, as of the date of verdict, of the future earnings, equivalent to an amount "which together with the investment return thereon when invested so as to yield the highest rate of return consistent with reasonable security, will pay the equivalent of lost future benefits at the times, in the amounts, and for the period that [the jury finds] such benefits would have been received." (BAJI No. 14.70 (1977 rev.); see *Fox* v. *Pacific Southwest Airlines, supra,* 133 Cal.App.3d 565, 568-587; Note, *Prejudgment Interest: An Element of Full Compensation In Wrongful Death Cases, supra,* U.Ill.L.Rev. 453, 482.) Thus, to the extent an award of damages is for future earnings after the date of verdict, plaintiffs may not recover prejudgment interest. (*Pago-Pago, supra,* 525 F.Supp. 1007, 1016; see Note, *Prejudgment Interest: An Element of Full Compensation In Wrongful Death Cases, supra,* U.Ill.L.Rev. 453, 455-456, fn. 15, for a clear example of this approach.) Accordingly, on retrial, the trial court should instruct the jury to answer a special interrogatory as to the amount awarded for past economic loss and then, in their discretion, award prejudgment interest on that amount. (See generally, *In re Air Crash Disaster Near Chicago, Ill., etc.* (7th Cir. 1981) 644 F.2d 633, 646.)

IV. Failure to Instruct the Jury to Return Separate Verdicts for Each Heir Did Not Deny Them Their Right to a Jury Trial

---

whole." (*Pago-Pago, supra,* at p. 1015.) Consequently, the last cited phrase from *Fox* is incorrect, as that particular standard is articulated only within section 3287, subdivision (a), and, if applied, could potentially defeat the underlying legislative purpose of section 3288 of guaranteeing the plaintiff is fully compensated.

The Canavins urge the trial court deprived each of them of the right to a jury trial when it refused to instruct the jury to return separate verdicts, or in the alternative, answer special interrogatories to show the amount of compensation it determined each heir was due.[8]

■■■■ Historically, an action for wrongful death in this state is rooted not in common law doctrine, but in legislative enactment which both created and limited the remedy. (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 572, 573-575 [139 Cal.Rptr. 97, 565 P.2d 122]; *Mayerhoff* v. *Kaiser Foundation Health Plan, Inc.* (1977) 71 Cal.App.3d 803, 806, fn. 3 [138 Cal.Rptr. 319].) "Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.'" (*Justus* v. *Atchison, supra,* 19 Cal.3d at p. 575, quoting *Pritchard* v. *Whitney Estate Co.* (1913) 164 Cal. 564, 568 [129 P. 989].) The wrongful death statute, Code of Civil Procedure section 377, subdivision (a) provides in pertinent part: "When the death of a person is caused by the wrongful act or neglect of another, his or her heirs or personal representatives on their behalf may maintain an action for damages against the person causing the death . . . . In every action under this section, such damages may be given as under all the circumstances of the case, may be just . . . . The respective rights of the heirs in any award shall be determined by the court."

■■■■ Throughout the provision's various amendments, case precedent has consistently held "only *one action* [can] be brought for the wrongful death of a person thereby preventing multiple actions by individual heirs and the personal representative." (*Mayerhoff* v. *Kaiser Foundation Health Plan, Inc., supra,* 71 Cal.App.3d 803, 805; *Robinson* v. *Western States Gas etc. Co.* (1920) 184 Cal. 401, 410 [194 P. 39]; *Salmon* v. *Rathjens* (1907) 152 Cal. 290, 294 [92 P. 733]; *Daubert* v. *Western Meat Co.* (1903) 139 Cal. 480, 481 [69 P. 297]; *Munro* v. *Dredging etc. Co., supra,* 84 Cal. 515, 522.) Moreover, the cause of action for wrongful death has been consistently characterized as "a joint one, a single one and an indivisible one." (*Watkins* v. *Nutting* (1941) 17 Cal.2d 490, 498 [110 P.2d 384]; *Gilmore* v. *Los Angeles Ry. Corp.* (1930) 211 Cal. 192, 199 [295 P. 41]; *Salmon* v. *Rathjens, supra,* 152 Cal. at p. 294; *Mayerhoff* v. *Kaiser Foundation Health Plan, Inc., supra,* 71 Cal.App.3d at p. 807; *Helling* v. *Lew* (1972) 28 Cal.App.3d 434, 437 [104 Cal.Rptr. 789].) The Supreme Court in *Cross* v. *Pacific Gas & Elec. Co.* (1964) 60 Cal.2d 690, 694 [36 Cal.Rptr. 321, 388

---

[8]The trial court instructed the jury on BAJI Nos. 14.50 and 14.51. The former instructs it to award damages to justly compensate for the loss each heir suffered, while the latter directs the jury to return a verdict in a single sum, representing the aggregate of the loss suffered by the heirs of the deceased.

P.2d 353], explained: "In stating that an action for wrongful death is joint, it is meant that all heirs should join or be joined in the action and that a single verdict should be rendered for all recoverable damages; when it is said the action is single, it is meant that only one action for wrongful death may be brought whether, in fact, it is instituted by all or only one of the heirs, or by the personal representative of the decedent as statutory trustee for the heirs; and when it is said that the action is indivisible, it is meant that there cannot be a series of suits by heirs against the tortfeasor for their individual damages. [Citation.]" The *Cross* court further characterized section 377 as: "a procedural statute establishing compulsory joinder and not a statute creating a joint cause of action" (*Cross* v. *Pacific Gas & Elec. Co.*, *supra*, 60 Cal.2d 690, 692); holding "[a]lthough recovery under section 377 is in the form of a 'lump sum,' the amount is determined in accordance with the various heirs' separate interests in the deceased's life and the loss suffered by each by reason of the death, . . ." and thus "each heir should be regarded as having a personal and separate cause of action" (*ibid.*); stressing "the interests of the heirs are separate rather than joint" (*id.*, at p. 693); and noting "strict compliance with the procedure specified in section 377 . . . authorizing an action for wrongful death is not jurisdictional or even mandatory in the sense that reversal of a judgment will necessarily follow a failure to comply with the requirements enumerated." (*Id.*, at pp. 693-694.)

Historical case precedent establishes that, in computing the damages, the court or jury must consider the pecuniary damage suffered by each heir and return an aggregate verdict for one sum. (*Watkins* v. *Nutting*, *supra*, 17 Cal.2d 490, 498; *Estate of Riccomi* (1921) 185 Cal. 458, 461 [197 P. 97, 14 A.L.R. 509]; *Perkins* v. *Robertson* (1956) 140 Cal.App.2d 536, 543 [295 P.2d 972].)

Long before the 1949 amendment to section 377 providing for judicial apportionment, the established procedure in this state where plaintiffs recovered judgment was for the court, in a separate proceeding, to apportion the amount to be awarded each heir. (*Watkins* v. *Nutting*, *supra*, 17 Cal.2d at p. 498; see also post-1949 amendment case law, *Mayerhoff* v. *Kaiser Foundation Health Plan, Inc.*, *supra*, 71 Cal.App.3d 803, 807; *Hernandez* v. *Fujioka* (1974) 40 Cal.App.3d 294, 301 [114 Cal.Rptr. 844]; *Changaris* v. *Marvel* (1964) 231 Cal.App.2d 308, 312-313 [41 Cal.Rptr. 774]; *Wiener* v. *United Air Lines* (S.D.Cal. 1964) 237 F.Supp. 90, 93.) While section 377 was silent regarding distribution of the proceeds among the heirs between its codification in 1872 and amendment in 1949, our Supreme Court construed the provision as providing a means "'for the family and each member thereof that which each could have expected to receive in the way of comfort and support from the lost father had he lived and kept the family

together, bestowing upon each such portion of his earnings as he or she were entitled to or required. *It* [*was*] *not intended that the amount recovered . . . be divided into integral proportional parts.* The persons entitled do not take as heirs or by succession, but as beneficiaries of the statute; "the statute being framed upon the theory that the heirs will always constitute the family of the deceased." ' " (*Simoneau* v. *Pacific Electric Ry.* (1911) 159 Cal. 494, 508 [115 P. 320]; *Robinson* v. *Western States Gas etc. Co., supra,* 184 Cal. 401, 410; italics added.) Thus, the court held the law did not authorize a verdict for separate damages for the individual plaintiffs, declaring the verdict should be given for a lump sum to all the plaintiffs, including the damages suffered by each of them. (*Robinson* v. *Western States Gas etc. Co., supra,* at p. 410; see also *Plecity* v. *Keilly* (1941) 44 Cal.App.2d 649, 650 [112 P.2d 960]; *Rickards* v. *Noonan* (1940) 40 Cal.App.2d 266, 271 [104 P.2d 839].)

 Because the cause of action for wrongful death is wholly statutory in origin, we are accordingly bound unless there exists a constitutional basis for departing from the clear expression of legislative intent. (*Mayerhoff* v. *Kaiser Foundation Health Plan, Inc., supra,* 71 Cal.App.3d 803, 807; *Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 119-120 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204].)

 "It is beyond dispute that the parties to an action for wrongful death have a right to trial by jury. (Cal. Const., art. I, § [16]; Code Civ. Proc., § 592.)" (*De Castro* v. *Rowe* (1963) 223 Cal.App.2d 547, 552 [36 Cal.Rptr. 53].) "The right to a trial by jury is a right to have the jury try and determine *issues of fact.*" (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 74, p. 2909; *Security Pac. Nat. Bank* v. *Lyon* (1980) 105 Cal.App.3d Supp. 8, 15 [165 Cal.Rptr. 95].) Ordinarily, the assessment of damages constitutes such a question of fact. (See *Dorsey* v. *Barba* (1952) 38 Cal.2d 350, 356 [240 P.2d 604], overruled on other grounds in *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828 [59 Cal.Rptr. 276, 427 P.2d 988].) Unless waived (see *Thibeault* v. *Brown* (1942) 92 N.H. 235 [29 A.2d 461, 462]), that right includes the determination of all facts properly at issue and presented by the evidence necessary to determine the aggregate award. Thus, it would appear plaintiffs upon joint request should be entitled to jury apportionment if the jury has been presented the case in a fashion requiring it to determine the damages sustained by each plaintiff before arriving at the aggregate award. (See *Sun Cab Company* v. *Walston* (1972) 15 Md.App. 113 [289 A.2d 804, 826]; *Tackett* v. *Tackett* (1935) 174 Okla. 51 [50 P.2d 293, 296]; *Chafin* v. *Norfolk & W. Ry. Co.* (1917) 80 W.Va. 703 [93 S.E. 822, 825-826].)[9] Otherwise, it appears patently inconsistent to instruct the

---

[9] Several courts have held it is the duty of the jury, or at least proper for it, to apportion the recovery by rendering separate verdicts for each of the plaintiffs, including: *Mobile &*

jury to separately assess and determine the damages to which each plaintiff is entitled and then to return an aggregate award without listing their necessary separate findings. (See *Peetz* v. *Masek Auto Supply Company, supra,* 74 N.W.2d 474, 481.) ■ However, although "[t]he jury as a fact-finding body occupies so firm and important a place in our system of jurisprudence that any interference with its function in this respect must be examined with the utmost care" (*Dorsey* v. *Barba, supra,* 38 Cal.2d 350, 356), the right to a trial by jury is not absolute, as the court upon insufficiency of the evidence can set aside a verdict and grant a motion for new trial, direct a verdict, order a nonsuit, or cause a remittitur or additur without violating the constitutional guarantee (see generally, 41 Cal.Jur.3d, Jury, § 2, p. 17; *Jehl* v. *Southern Pac. Co., supra,* 66 Cal.2d at p. 821). Indeed, "[t]he constitutional guarantee [of a jury trial] does not require adherence to the letter of common law practice, and new procedures better suited to the efficient administration of justice may be substituted if there is no impairment of the substantial features of a jury trial." (*Dorsey* v. *Barba, supra,* 38 Cal.2d at p. 356; *Jehl* v. *Southern Pac. Co., supra,* 66 Cal.2d at pp. 828-829; *Smith* v. *Superior Court* (1979) 93 Cal.App.3d 977, 980 [156 Cal.Rptr. 149].) ■ We conclude judicial apportionment in this setting is designed to promote the efficient administration of justice and does not substantively impair the right to jury trial, and is consistent with the underlying nature of the California statutory remedy for wrongful death.

As already noted, section 377 originally was silent regarding apportionment of the lump-sum award among the heirs. This was apparently due to the underlying theory of the California statutory remedy for wrongful death as being a means of providing for the family and each member of it that which each would have expected to receive by way of comfort and support from the decedent had he or she lived and kept the family together and, thus, the statute was framed upon the theory the heirs would always consti-

---

O. R. Co. v. *Williams* (1930) 221 Ala. 402 [129 So. 60, 67]; *Louisville & N. R. Co.* v. *Jolly's Adm'x* (1930) 232 Ky. 702 [23 S.W.2d 564, 574]; *Sun Cab Company* v. *Walston, supra,* 289 A.2d 804, 826; *Peetz* v. *Masek Auto Supply Company* (1956) 161 Neb. 588 [74 N.W.2d 474, 481]; *Weaks* v. *Mounter* (1972) 88 Nev. 118 [493 P.2d 1307, 1311]; *Hurley* v. *Hurley* (1942) 191 Okla. 194 [127 P.2d 147, 150]; *Tackett* v. *Tackett, supra,* 50 P.2d 293, 296; *Texas & N. O. R. Co.* v. *Scarborough* (Tex.Civ.App. 1907) 104 S.W. 408, 414 affd. (1908) 101 Tex. 436 [108 S.W. 804]; *Fogarty* v. *Northern Pac. Ry. Co.* (1913) 74 Wash. 397 [133 P. 609, 611]; *Chafin* v. *Norfolk & W.Ry. Co., supra,* 93 S.E. 822, 825-826; and see, *Horsford* v. *Estate of Horsford* (Alaska 1977) 561 P.2d 722, 727.

For a review of the varying and conflicting state rules on this question, see 14 A.L.R. 516 (1921) 112 A.L.R. 30 (1938) and 171 A.L.R. 204 (1947).

Finally, we note the Model Survival and Death Act (U.L.A.) § 3(f), provides in pertinent part: "The trier of fact shall make separate awards to each of the survivors entitled to damages." The accompanying comment explains: "The duty of determining individual awards could be assigned to either judge or jury, or both. There are definite advantages in having the apportionment of the damages made by the same person or group that fixes the amount of the total award. This normally would be the jury."

tute the family of the deceased. (*Simoneau* v. *Pacific Electric Ry.*, *supra*, 159 Cal. 494, 508.) It was never intended the amount recovered would be divided into integral or proportional parts. (*Ibid.*) Indeed, where multiple plaintiffs recovered a judgment, the court had no duty to separately apportion the amount to be awarded each heir except on request. (See *Gilmore* v. *Los Angeles Ry. Corp.*, *supra*, 211 Cal. 192, 199 [295 P. 41]; *Estate of Riccomi* (1921) 185 Cal. 458, 463-464 [197 P. 97, 14 A.L.R. 509]; *Rose* v. *San Diego Electric Ry. Co.* (1933) 133 Cal.App. 646, 651 [24 P.2d 838].) However, it was not reversible error for a jury, upon instructions, to return a verdict for separate damages to each heir. (*Robinson* v. *Western States Gas etc. Co.*, *supra*, 184 Cal. 401, 410-411.) Moreover, "[w]here the personal representative [brought] the action and [recovered] damages, he [held] this fund as a statutory trustee and [was obligated to] distribute it among the heirs upon the basis of the pecuniary loss to each. If there was a dispute among the heirs with respect to the share each [should] receive, an action [could] be brought by the parties to the dispute in the superior court for an accounting and for the distribution of the trust fund in which the heirs of the deceased have a beneficial interest. [Fns. omitted.]" (Killion, *Wrongful Death Actions In California, Some Needed Amendments* (1937) 25 Cal.L.Rev. 170, 183 (*Wrongful Death Actions*).)

The 1949 statutory amendment to provide for judicial apportionment appears based upon legislative acknowledgment of the respective heirs' competing interests in the lump-sum award. The amendment reflects a belief it was more desirable not to add to the jury's burden the task of apportioning the damages (see *Wrongful Death Actions*, at p. 184), and the practical consideration the trial judge had already heard the evidence of the pecuniary loss as to each heir and thus was the most desirable party to apportion the damages. (*Ibid.*; see also, *Changaris* v. *Marvel*, *supra*, 231 Cal.App.2d 308, 313.) Consequently, in partial reliance upon the amendment to section 377 providing for judicial apportionment, our Supreme Court later acknowledged the amendment clearly established the interests of the heirs as separate rather than joint, holding each heir should be regarded as having a personal and separate cause of action while confirming the statutory cause of action itself was joint in nature requiring the rendering of a single verdict for all recoverable damages. (*Cross* v. *Pacific Gas & Elec. Co.*, *supra*, 60 Cal.2d 690, 692-694.)

Our review of the foregoing historical background of the California wrongful death remedy compels us to conclude legislative delegation of apportionment to the court is constitutional, promoting the nature of the remedy as envisioned by its creators without substantively depriving any heir of the right to a jury trial. As to the former, the lump-sum award reflects the underlying theory the family unit suffered as a whole and the

proceeds will perpetuate the continuation of the family of the deceased in the same manner regarding comfort and support had the decedent lived and kept the family together. Consequently, we believe the Legislature envisioned and created a cumulative wrongful death cause of action singular in nature and, upon recovery, productive of a single verdict for all damages suffered regardless whether it be instituted by all or only one of the heirs or by the personal representative of the decedent as statutory trustee for the heirs. As to the latter, judicial apportionment does not deprive any heir of the right to a jury determination of individual damages because the nature of the remedy, especially regarding the loss of monetary support, envisions a lump-sum, unapportioned award.

The determination of the total amount of lost monetary support derived from earnings is not affected by the individual interests the heirs have in that fund. Consequently, determination of the heirs' respective interests in that portion of the recovery is unnecessary in reaching the aggregate award and, where minor children are involved, need not and should not be later apportioned under most circumstances by the court in a separate proceeding. For, aside from the difficulty in ascertaining respective interests in such a fund as the demand for support varies among minor heirs from day to day due to their individual age and particular circumstances, in the present case where the recovery for loss of monetary support is for the benefit of a widow and her minor children, there is no recognizable need to apportion the amount between them as naturally the minor children will receive full benefit from any award made to the mother, enjoying through their minority the benefits provided by the fund while they are protected by the umbrella and security of the family unit. ▮▮▮ ▮▮ ▮▮▮ ▮▮ (*Sabine Towing Co.* v. *Brennan* (5th Cir. 1936) 85 F.2d 478, 482, reversed on other grounds in *Van Beeck* v. *Sabine Towing Co.* (1937) 300 U.S. 342 [81 L.Ed. 685, 57 S.Ct. 452].)[10]

---

[10]Judicial apportionment in this case is consistent with historical precedent which has relied upon the equity powers of the court in dividing such funds, regardless whether the recovery was the result of compromise, settlement, litigation instituted by a personal representative of the decedent as a statutory trustee for the heirs, or trial litigation pursued by any of the heirs. (See, e.g., *Hernandez* v. *Fujioka, supra,* 40 Cal.App.3d 294, 304.) Narrowly focusing upon the apportionment proceeding, we note where a statutory remedy has been created and the issue is posed regarding whether the right to jury trial attaches, we look to whether there exists a counterpart in English practice or whether the nature of the remedy involved resembles more a traditional legal, rather than a traditional equitable, remedy. (*Southern Pacific Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433, 436 [129 Cal.Rptr. 912].) For, generally the right to jury trial exists in a civil action at law but not in equity. (*C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 8 [151 Cal.Rptr. 323, 587 P.2d 1136]; *Smith* v. *Superior Court, supra,* 93 Cal.App.3d 977, 980 [156 Cal.Rptr. 149].) Moreover, "[a] jury cannot be demanded as a matter of right in a special proceeding unless it is expressly made available by statute [citations]." (*Taliaferro* v. *Hoogs* (1965) 236 Cal.App.2d 521, 529 [46 Cal.Rptr. 147]; *Kinder* v. *Superior Court* (1978) 78 Cal.App.3d 574, 581 [144 Cal.Rptr. 291].) We conclude an apportionment proceeding is equitable in character as well as akin to a special proceeding. Finding no Cali-

Further, the adjudication by the court in a separate proceeding of the heirs' competing interests in that portion of the lump-sum award attributable to loss of direct economic support avoids unnecessarily complicating issues before the jury in the underlying action. As the United States Supreme Court aptly stated many years ago: "Indeed, to make them . . . [apportion the damages] would, in many cases, double the issues; for, in connection with the determination of negligence and damage, it would be necessary also to enter upon an investigation of the domestic affairs of the deceased,—a matter . . . not for jurors." (*Central Vermont R. Co.* v. *White* (1915) 238 U.S. 507, 515 [59 L.Ed. 1433, 1438, 35 S.Ct. 865, 869].) Jury apportionment would require (in cases involving minors) individual legal representation for each minor heir, as well as separate guardian ad litems other than the surviving spouse—a probable party in the action, because of absolute conflicts of interest between the parties and their joint counsel. Similarly, in cases not involving minors, if joint counsel has been secured by the plaintiffs, a stipulation would be required in order to obtain separate verdicts. Where the action is brought by the personal representative of the decedent as statutory trustee for the heirs, a stipulation signed by all adult heirs and the independent counsel for any minor heirs would be necessary.

In summary, the competing and conflicting interests of the respective heirs, the difficulty in ascertaining individual shares of lost economic support when dealing with minors, the lack of any reason under most circumstances to apportion the lump-sum award attributable to loss of monetary support where minors are involved, the irrelevance of the heirs' respective interests in that portion of the award pertaining to lost economic

---

fornia case precedent in point, we look elsewhere and find, although Lord Campbell's Act provided the apportionment be made by the jury (*McLaughlin* v. *United Railroads* (1915) 169 Cal. 494, 495 [147 P. 149]; 1 Speiser, Recovery for Wrongful Death, *supra,*—par. 1.8, p. 28; 22 Am.Jur.2d, Death, § 179, p. 734; 74 A.L.R. 11, 14 (1931); 14 A.L.R. 516, 519 (1921)), English case precedent holds "[t]he remedy of the [heirs] to secure an apportionment of the fund is in equity, and not by action at law." (14 A.L.R. 516, 518 (1921), reporting *Condliff* v. *Condliff* (1874) 29 L.T.N.S. (Eng.) 831, 22 Week.Rep. 325; see also *Bulmer* v. *Bulmer* (1883) L.R. 25, Ch. Div. (Eng.) 409, 53 L.J.CH.N.S. 402, 32 Week.Rep. 380.) Likewise, in *Hernandez* v. *Fujioka, supra,* 40 Cal.App.3d 294, 304, a trial court proceeding for the approval of a compromise settlement following a wrongful death judgment and allocation of the settlement was essentially treated as an equitable proceeding. Moreover, this statutory apportionment proceeding is at least analogous to partition, a special statutory proceeding (Code Civ. Proc., § 872.010 et seq.), consistently characterized as equitable in nature. (*Elbert, Ltd.* v. *Clare* (1953) 40 Cal.2d 498, 501 [254 P.2d 20]; *Jameson* v. *Hayward* (1895) 106 Cal. 682, 687-688 [39 P. 1078]; *Richmond* v. *Dofflemyer* (1980) 105 Cal.App.3d 745, 766 [164 Cal.Rptr. 727]; *Penasquitos, Inc.* v. *Holladay* (1972) 27 Cal.App.3d 356, 358 [103 Cal.Rptr. 717]; *Elbert, Ltd.* v. *Federated etc. Properties* (1953) 120 Cal.App.2d 194, 200 [261 P.2d 743].) Finally, and perhaps alternatively, since the apportionment proceeding is set up by the wrongful death statute in the nature of a postjudgment, ancillary, special proceeding unknown at common law, there is no right to jury determination of the respective interests of the heirs in the lump-sum award absent statutory authorization. (Compare *In re De La O.* (1963) 59 Cal.2d 128, 150 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].)

support in determining the aggregate award, and the more efficient nature of court proceedings without a jury, cumulatively establish apportionment by the court, rather than the jury, is consistent with the efficient administration of justice.

However, our Supreme Court has expressly characterized section 377 as a "procedural" and "not jurisdictional" statute whose procedural provisions can be waived. (*Cross* v. *Pacific Gas & Elec. Co., supra,* 60 Cal.2d 690, 692-694.) Consequently, where all statutory plaintiffs, properly represented by legal counsel waive judicial apportionment, the trial court should instruct the jury to return separate verdicts unless the remaining considerations enumerated above mandate refusal. Accordingly, we conclude the plaintiffs here were not deprived of their constitutional right to a jury trial by the trial court's refusal to instruct the jury to return separate verdicts.[11]

Although we conclude the trial court did not err in refusing to instruct the jury to return separate verdicts, we find no reason why, when all properly represented plaintiffs request, the trial court in a wrongful death action should not instruct the jury to return special findings regarding damages as to each heir where the evidence presented permits such findings. In other words, in this case special interrogatories as requested should have been submitted to the jury regarding its determination of both the total unapportioned loss of past and future economic loss. Regarding the remaining recoverable damages related to nonmonetary support, where the evidence discloses the expectations for recovery of the various heirs would vary, the jury should be permitted to render special findings on a joint request by all plaintiffs. Although the findings would normally be advisory to the trial court at a later apportionment proceeding, valid stipulations by all parties should make them binding. We see no potential prejudice to either party. Assuming valid stipulations, we anticipate no potential conflict of interest among the plaintiffs and their respective counsel who may ethically argue each client's cause in an attempt to maximize the size of the lump-sum award. ▮▮▮ Further, "[t]he defendant has no interest in the division

---

[11]As implied in our analysis, we do not believe the proposition that because an action for wrongful death constitutes a creature of statute, it exists only so far and in favor of such persons the legislative power may declare (*Justus* v. *Atchison, supra,* 19 Cal.3d 564, 575), includes the right of the Legislature to determine whether a plaintiff is entitled to a jury. Otherwise, case precedent would not direct us to look for any counterpart in English practice or scrutinize the nature of the remedy as being either traditionally legal or equitable in character in determining whether a right to jury trial necessarily accompanies the creation of a statutory remedy which does not constitute a special proceeding. (See *Southern Pac. Transportation Co.* v. *Superior Court, supra,* 58 Cal.App.3d 433, 436; *Kinder* v. *Superior Court, supra,* 78 Cal.App.3d 574, 581; *Taliaferro* v. *Hoogs, supra,* 236 Cal.App.2d 521, 529.)

which the plaintiffs may make among themselves, or which may be made for them, of the damages recovered. The statute contemplates a single recovery for the benefit of the family of the deceased to those of his heirs who are dependent upon him for support. Whether it is divided among them after recovery or not, or how it is divided, are matters of no concern to the defendant." (*Robinson* v. *Western States Gas etc. Co., supra,* 184 Cal. 401, 410-411; *Cate* v. *Fresno Traction Co.* (1931) 213 Cal. 190, 203-204 [2 P.2d 964]; *Rickards* v. *Noonan, supra,* 40 Cal.App.2d 266, 271.)[12] Special findings would promote the allocation of the total award in a manner consistent with the jury's intent as to those issues of fact before them regarding the heirs' respective interests in that portion of the lump-sum award relating to the loss of nonmonetary support in accordance with an approved general practice in this state (see *Griffey* v. *Pacific Electric Ry. Co.* (1922) 58 Cal.App. 509, 523 [209 P. 45]; and *Bowen* v. *Kizirian* (1930) 105 Cal.App. 286, 289 [287 P. 570]).

*Disposition*:[13]

Judgment reversed.

**STANIFORTH, J.,**—Concurring and Dissenting.—

---

[12]Parties here concede there would have been no potential prejudice to either.

[13]Plaintiffs' remaining contentions are not addressed in the body of this opinion. We dispose of them in the following manner:

PLAINTIFFS' EVIDENTIARY CONTENTIONS ARE MERITLESS

The Canavins next contend the trial court erroneously excluded evidence on several occasions, rejecting: (1) evidence regarding the credentials of the scientists employed within decedent's field of expertise regarding decedent's future earning capacity; (2) offers of proof relating to the abilities and earning capacity of the decedent; (3) postaccident facts as not relevant while inconsistently permitting PSA to offer postaccident economic facts of interest rates; (4) Madonna Canavin's offer of proof regarding relevant subjects pertinent to care, comfort, society, companionship, solace, moral support, protection, love and loss of support; and (5) "huge hunks of important deposition testimony of out-of-state witnesses."

(1) *The Credentials and Qualifications of the Scientists*

The trial court curtailment of the Canavins' effort to establish every credential and qualification of Dr. Leonard Meirovitch, Dr. Sherman Seltzer, Dr. Peter Likens, Dr. Keto Soosaar and Dr. Andrew Milstead was well within its discretion to refuse to admit cumulative evidence. " '[T]he exclusion of evidence which has only a cumulative effect will not justify reversal on appeal. . . .' " (*Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 371 [131 Cal.Rptr. 78, 551 P.2d 398], quoting in part *Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 247 [43 Cal.Rptr. 364]; Evid. Code, § 352.) Here, Dr. Meirovitch testified to his bachelor of science degree summa cum laude, a masters degree and a Ph.D. from U.C.L.A., being a specialist in decedent's field of dynamics and vibrations, his professorship at Arizona State University, the University of Cincinnati and Virginia Polytechnic, and his associate fellowship in the American Institute of Mechanical Engineers; Dr. Seltzer testified he received a bachelor of science degree in mechanical engineering from U.C.L.A., a master of design degree and two master of science degrees from the University of Michigan, and a Ph.D. from Auburn University, he was with the Army ballistic missile agency from 1950-1962 developing the guidance and control systems of ballistic missiles, with NASA from 1962-1967 working on flexible satellites, with Lockheed as a chief engineer of a reconvey-

ance aircraft from 1967-1969, with NASA from 1969-1978 working again with flexible satellites, and with his own company until present doing independent research and counselling in the field of dynamics and control, and he was an associate fellow with the American Institute of Aeronautics and Astronautics; Dr. Likens testified he was provost at Columbia University in New York City, he received a bachelor of science degree from Stanford University in civil engineering, a master of science degree in civil engineering from M.I.T., and a Ph.D. in engineering mechanics from Stanford University, his doctoral dissertation was on flexible space craft dynamics, he worked with the Jet Propulsion Laboratory in Pasadena from 1958-1960 until returning to Stanford University for his doctorate, he joined the faculty at U.C.L.A. upon completion of his doctorate, remaining for 12 years and serving in various teaching positions and also as assistant dean in 1975 at the School of Engineering in Applied Science, and in 1976 he became dean of the School of Engineering in Applied Science at Columbia University, but continued his institutional research for Draper Laboratories, Convair Division of General Dynamics, Honeywell Inc., and others; Dr. Soosaar testified by deposition he received his bachelors degree at McGill University in Montreal and his masters and doctorate degrees from M.I.T., his doctoral thesis was on the optimization of structural form, and he was the leader of the large space structures division in the advance systems department at the Draper Laboratory, Inc.; and Dr. Milstead testified he received a bachelors degree in physics from the University of North Carolina, a master of science and physics from Ohio State University, and a master of arts in astronomy from U.C.L.A. as well as a Ph.D. in aerospace engineering from U.C.L.A., he was an expert in astrodynamics, he had been employed by Hughes Aircraft Corporation for 11 years, and he was an aerospace engineer for the latter company. A review of the credentials excluded by the trial court, including the number of articles witnesses had written in their field, whether the witnesses were editors in their field, and other professional societies to which the witnesses belonged, shows the court did not abuse its discretion. (Evid. Code, § 352.)

(2) *Offers of Proof of Decedent's Abilities Earnings and Destroyed Future Earnings*

The Canavins argue the trial court improperly excluded testimony of Dr. Milstead, aerospace engineer Quarterraro and Colonel Alen F. Herzberg, that witnesses Dr. Likens and Dr. Meirovitch were considered the top two men in their field. They contend the jury was unable to properly weigh those scientists' testimony regarding decedent's outstanding qualifications. Exclusion was within the proper exercise of the trial court's discretion. The record is replete with uncontradicted evidence of decedent's stature in his career field and excluding the proffered evidence was not an abuse of discretion.

(3) *The Trial Court's Ruling Regarding Postaccident Facts*

The Canavins argue the trial court ruled inconsistently and erroneously in excluding postaccident economic facts of actual salaries earned by decedent's peers to show decedent's future earning potential as evidence of lost support, while allowing PSA to offer postaccident economic facts of interest rates to attempt to reduce the family's loss by the higher discount rate. However, no arguments are made, no authority is cited, and no prejudice is shown. We may presume the contention is without foundation. (*Morris* v. *Associated Securities, Inc.* (1965) 232 Cal.App.2d 220, 231 [42 Cal.Rptr. 607]; *People* ex rel. *Dept. of Public Works* v. *Garden Grove Farms* (1965) 231 Cal.App.2d 666, 674 [42 Cal.Rptr. 118]; *Thompson* v. *Keckler* (1964) 228 Cal.App.2d 199, 213 [39 Cal.Rptr. 267]; *Givens* v. *Southern Pacific Co.* (1961) 194 Cal.App.2d 39, 47-48 [14 Cal.Rptr. 736].)

In any event, regarding the alleged inconsistent rulings by the trial court, it was the Canavins who first introduced evidence of postaccident interest rates, not PSA. Upon tender of the evidence, the trial judge promptly determined defense counsel had no objection to the material. The court then allowed the evidence. The Canavins may not now complain PSA was allowed to introduce similar evidence.

(4) *Madonna Canavin's Offer of Proof*

The Canavins urge the trial court refused to receive Madonna's offer of proof pertinent to care, comfort, society, companionship, solace, moral support, protection, love and loss of support. Again, as in the contention above, they fail either to explain why the exclusion of the evidence was prejudicial or to clothe their naked assertion with citation to authority, or

conclusions expressed by Justice Work in sections I, III and IV of his lead opinion. As to section II, I concur in the result insofar as it mandates reversal of the judgment, requiring retrial. ■ I do not agree with Justice Work's admission of evidence of decedent's *after tax* earnings as a base for the jury's assessment of damages for future financial support lost. The improper and prejudicial admission of such evidence here mandates reversal.

Numerous California decisions as well as rulings of the courts of other jurisdictions exclude income tax projections from the jury's consideration. The leading California case holds "income tax consequences are of no relevance in personal injury litigation." (*Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 664 [151 Cal.Rptr. 399].) This is the "majority" rule in California as well as the entire United States.[1]

The California view was fully expressed in *Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872, 879 [59 Cal.Rptr. 76]: "We think the court was correct in refusing to give any instruction on the subject of income taxes. The majority of courts to consider income tax instructions have concluded they should be rejected. (See *McWeeney* v. *New York, N.H. & H.R.R. Co.*, 282 F.2d 34, 36-39; *Altemus* v. *Pennsylvania R.R. Co.*, 32 F.R.D. 7; *Hall* v. *Chicago & Northwestern R.R. Co.*, 5 Ill.2d 135 . . .; *Stokes* v. *United States*, 144 F.2d 82, 87; *Chicago & Northwestern Ry. Co.* v. *Curl*, 178 F.2d 497; *Southern Pac. Co.* v. *Guthrie*, 186 F.2d 926, 927-

---

even argument.

(5) *Deposition Testimony of Out-of-state Witnesses*

"The trial court improperly disallowed huge hunks of important deposition testimony of out-of-state witnesses." The Canavins allege approximately 40 percent of Likens' deposition, 60 percent of Robert Duffy's deposition, 67 percent of Soosaar's deposition, 50 percent of Herzberg's deposition, 25 percent of O'Connor's deposition, and all but 11 pages of Martin Furey's deposition was not read to the jury. Having recited these bare statistics, they do not drop the other shoe. We are not told where, if at all, error lurks in this matrix, nor how prejudice may have resulted. None appears from reading the record.

THE CANAVINS' ASSERTION THE TRIAL COURT'S CONDUCT
DENIED THEM A FAIR TRIAL

The Canavins contend the trial court intimidated and argued with witnesses, was hostile toward their counsel and constantly employed sarcasm and lacked judicial patience. We do not address this charge because of our reversal of the judgment; however, we assume such conduct, if it occurred, will be avoided on any retrial.

[1]Admitting this evidence (or instructions thereon of the court) flies in the face of the decisions of an overwhelming majority of the American jurisdictions that have considered the question. "It is the general view, supported directly or inferentially by a majority of American cases, that in fixing damages for destruction of earning capacity because of death, the income tax consequences on the award should not be taken into consideration; on the contrary, the award of damages should be based on *gross* earnings or earning capacity and should not be reduced because of any income tax savings which may result from the fact that the damage award will be exempt from income tax." (Speiser, Recovery for Wrongful Death 2d (1975) at pp. 744-745, fn. omitted.) (See Annot. 63 A.L.R.2d 1393, 1398 (1959), and 63 A.L.R.2d Later Case Service, volume 63, pocket part supp., p. 287; and cases cited in Speiser, *supra, ibid.*)

928; see also 2 Harper & James, Torts, § 25.12.) In *Altemus,* the court declared: 'In every American case except one, the Courts have held either that the failure to grant such a prayer is not reversible error or, conversely, that the granting of such a prayer is reversible error [citations].' *Only one case, so far as we are able to find, has directly held that it is error to refuse an instruction such as that offered by appellant here (Floyd* v. *Fruit Industries,* 144 Conn. 659 [136 A.2d 918 . . .]); in another case (*Dempsey* v. *Thompson,* 363 Mo. 339 [251 S.W.2d 42, 45]) the giving or withholding of such an instruction was held to be a matter of discretion with the trial judge." (Italics added.) (See also *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 859 [139 Cal.Rptr. 888, 93 A.L.R.3d 537]; *Mackey* v. *Campbell Construction Co.* (1980) 101 Cal.App.3d 774, 789 [162 Cal.Rptr. 64]; see also BAJI No. 14.82 (6th ed. 1977).

This court in *Irwin* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709 [184 Cal.Rptr. 228], upheld the trial court's refusal to give an "income tax" instruction based expressly upon the authority and reasoning of the *Rodriguez* v. *McDonnell Douglas Corp., supra,* 87 Cal.App.3d 626. The *Rodriguez* court reasoned: "[A]doption of the rule which would permit the introduction of evidence of future tax consequences to affect the amount of an award in personal injury and wrongful death actions would open the door to *intense speculation* about the future on the part of the jury. The ramifications of such a rule of law would be immense. The less speculation that is involved in the jury's factfinding process, the more likely will jury awards conform to the standard of fairness and justice between litigating parties." (*Rodriguez,* at pp. 667-668.) Diligent research has failed to disclose a single California case approving use of such evidence.

Justice Work's dissent relies on federal cases, particularly *Norfolk & Western R. Co.* v. *Liepelt* (1980) 444 U.S. 490 [62 L.Ed.2d 689, 100 S.Ct. 755]. This court pointed out in *Irwin* v. *Pacific Southwest Airlines, supra,* 133 Cal.App.3d 709, 717, the *nonbinding* character of the United States Supreme Court decision: "In *Norfolk & Western R. Co.* v. *Liepelt, supra,* 444 U.S. 490, the wrongful death action arose under the Federal Employers' Liability Act. The holding was based on federal statutory interpretation, not constitutionality. *Thus the decision is not binding on this court.* Moreover, the *Liepelt* decision involved an F.E.L.A. action which crucially distinguishes it from a case involving an action under state law (see *Vasina* v. *Grumman Corp.* (2d Cir. 1981) 644 F.2d 112, 118; see also *Rodriguez* v. *McDonnell Douglas Corp.* 87 Cal.App.3d 626, 667 . . . [distinguishing federal cases dealing with liability under the Federal Tort Claims Act which allowed the 'no income tax' instruction]). The trial court did not err in refusing the instruction." (Italics added.)

Other state courts as well have refused to adopt the *Norfolk & Western R. Co.* rule. (See, e.g., *Yukon Equipment, Inc.* v. *Gordon* (Alaska 1983) 660 P.2d 428, 433-435.) The Illinois appeal court in *Newlin* v. *Foresman* (1982) 103 Ill.App.3d 1038 [432 N.E.2d 319, 325-326] said: "The Illinois Supreme Court has ruled that juries should not be instructed on the tax consequences of damage awards. [Citations.] The defendant argues that these cases are overruled by *Liepelt,* because they are also FELA cases. Although this is true as to FELA cases, *this court, however, is not bound by Liepelt* as to claims arising under state law." (Italics added.) Said the Illinois Supreme Court: "*Liepelt* does not apply to actions predicated on state statutes." (*Christou* v. *Arlington Park-Washington Park* (1982) 104 Ill.App.3d 257 [432 N.E.2d 920, 925].) Consideration of tax consequences "would be error." (*Sullivan* v. *Held* (1981) 81 App.Div.2d 663 [438 N.Y.S.2d 359]; *Louissaint* v. *Hudson Waterways Corp.* (1981) 111 Misc.2d 122 [443 N.Y.S.2d 678, 681]; *Delmarva Power & Light Co.* v. *Burrows* (Del. 1981) 435 A.2d 716, 721.)

Several lower federal courts have excluded, even *after the Liepelt decision,* consideration of income tax in computing damages where state laws are involved. (*Draisma* v. *United States* (W.D.Mich. 1980) 492 F.Supp. 1317; *Croce* v. *Bromley Corp.* (5th Cir. 1980) 623 F.2d 1084; *Estate of Spinosa* (1st Cir. 1980) 621 F.2d 1154 (*Liepelt* does not mandate across-the-board changes in majority rule).) (See also 63 A.L.R.2d (Later Case Service, 1983 pocket supp.) p. 350.)

For a wide variety of good reasons courts have rejected jury consideration of income tax consequences. The rationale for exclusion are: (1) Income tax instructions are conjectural and open the door to intense speculation. (*Rodriguez* v. *McDonnell Douglas Corp., supra,* 87 Cal.App.3d 626, 667-668.) (2) The instructions are too difficult and too complex to follow. (*Plourd* v. *Southern Pacific Transportation Co.* (1973) 266 Ore. 666 [513 P.2d 1140].) (3) Tax consequences are collateral, speculative and conjectural. (*Scalise* v. *Central Railroad Company of N.J.* (1974) 129 N.J.Super. 303 [323 A.2d 525].) (4) Tax considerations raise more problems than are solved. (*Raines* v. *New York Central Railroad Co.* (1972) 51 Ill.2d 428 [283 N.E.2d 230]; *Briggs* v. *Chicago Great Western Railway Co.* (1957) 248 Minn. 418 [80 N.W.2d 625].) (5) Consideration of tax consequences would nullify any tax benefits for damage awards conferred by Congress. (*Dixie Feed & Seed Co.* v. *Byrd* (1963) 52 Tenn.App. 619 [376 S.W.2d 745].) (6) Tax issues are extraneous. (*Michaud* v. *Steckino* (Me. 1978) 390 A.2d 524.) (7) A long-standing rule of exclusion should not be overruled. (*St. Louis Southwestern Ry. Co.* v. *Greene* (Tex Civ.App. 1977) 552 S.W.2d 880; *Yukon Equipment, Inc.* v. *Gordon, supra,* 660 P.2d 428, 434.)

The defendant argues: Because taxes are an inevitable expense they may be used to reduce the present cash value of a wrongful death award. This position loses sight of the reason a defendant is required to pay damages to a plaintiff when his negligence causes injury. There is strong public policy in California law mandating a full fair measure of compensation for tort caused injuries. Although some interpolations are necessary when a jury determines future earnings, such projections are made within the bounds of enormous statistical experience developed by experts whose area of knowledge and expertise have long been accepted in the scholarly-scientific community in which it was developed. Such evidence meets the "Frye" test. (*Frye* v. *United States* (1923) 293 F. 1013, 1014 [34 A.L.R. 145].) Moreover, such evidence is admitted out of necessity. But for the defendant's negligence plaintiff would be alive and in all reasonable probability supporting his family for the protected period of time.[2] This prediction of future earnings is made necessary by defendant's duty to make the plaintiff whole. No such legal-societal mandate urges jury consideration of income tax consequences.[3]

Finally, to allow the defendant to reduce the award by the estimated amount of income tax would create a windfall for the defendant. The negligent defendant should not benefit by the fortuitous event the person injured may be subject (or not subject), in a totally unknown and unpredictable amount, to income tax. A defendant should not be allowed to "take advantage of his own wrong." (Civ. Code, § 3517.) "The justice of the [exclusion] rule is that damages wrought by a wrongdoer are measured by the whole loss. The party injured is entitled to recover for all the loss inflicted and the wrongdoer may not take advantage of the contracts or other relation that may exist between injured persons and third persons. The ethics of the rule are that the wrongdoer should not have the benefit of a fund or contract directly or indirectly or by circumvention, to which he in no wise has contributed." (*Majestic* v. *Louisville & N. R. Co.* (6th Cir. 1945) 147 F.2d 621, 627; see also Beall, Wrongful Death and Survivorship, NACCA Seminar 1957, § 3.12, p. 85.)

---

[2]See *Rodriguez* v. *McDonnell Douglas Corp.*, *supra*, 87 Cal.App.3d at page 667.

[3]Although future earnings will be affected by fluctuating economic conditions, they are the subject of scholarly analysis, recordation and prediction. Income tax consequences are influenced by the economy *and* political trends—totally unpredictable forces. Who could predict the course of real property taxation in California, or the precipitous decline in income tax payable by corporations since 1970 or the equally precipitous decline of taxes paid by individual taxpayers in higher income brackets since 1981. Historically, income tax rates are as variable as political views of the voting public. Predicting wind velocity and direction is much less speculative. State or national Legislatures or the people by the initiative process can radically change taxes or abolish them in the time it takes to hold an election. (See Butter, *The Flat Tax: The Challenge of Finding the Right Formula*, L.A. Daily J. (Oct. 5, 1982) p. 4.)

Until the reasons for the exclusion rule are shown to be no longer valid we should follow the established law, to wit: In measuring a plaintiff's damages in a wrongful death action income tax consequences on a decedent's projected future earnings are irrelevant and so subject to "intense speculation" as to preclude admissibility.

Brown (Gerald), P. J., concurred.

**WORK, J.**—I respectfully dissent to Justice Staniforth's concurring opinion holding evidence of a decedent's after-tax earnings as a base for the jury's assessment of damages for lost future financial support is too conjectural to be admitted.[1] Rather, I believe such evidence is admissible subject to the discretion of the trial court, and find the impact of future income taxes to be a matter much less speculative than other issues ordinarily resolved by the jury.[2]

The precise issue posed here is whether the trier of fact, "in assessing the pecuniary loss sustained by each heir, may, in determining how much money the deceased would have had to contribute to the support of the heirs, consider the deceased's income after payment of income taxes, and whether the parties may introduce evidence to show the deceased's income tax liability." (Johns, California Damages (2d ed. 1977) § 5.30, p. 252.) I concur with Johns' statement: "Obviously, the deceased could not have contributed more money for the heirs' support than he would have had. Therefore, if the plaintiff testifies as to the deceased's gross earnings before his death, the defendant should be allowed to cross-examine the plaintiff concerning the amount of income taxes the deceased would have had to pay on those earnings." (*Ibid.*) In *Norfolk & Western R. Co.* v. *Liepelt* (1980) 444 U.S. 490, 493-494 [62 L.Ed.2d 689, 693-694, 100 S.Ct. 755, 757], the United States Supreme Court specifically addressed this issue and declared: "The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his

---

[1] Most courts refusing to admit incidents of future tax as too conjectural do so in the context of requested cautionary instructions advising jurors the claimant's award will be nontaxable. (See Comment, *Computation of Lost Future Earnings in Personal Injury and Wrongful Death Actions* (1977-1978) 11 Ind.L.Rev. 667, 687-691.) This is the single issue to which the majority of cases cited in the concurring opinion are confined. It is not the issue here.

[2] For instance, choosing a proper rate to discount an award to present value based upon the rate of return on a prudent investment. The marked fluctuation in interest rates immediately before and since the trial of this case is a striking example.

dependents when he dies." In a thorough and substantive analysis, the 9th Circuit in *Burlington Northern, Inc.* v. *Boxberger* (1975) 529 F.2d 284, 291, held: "Given the undeniable fact that the question is what amount would have been available to the survivors for support from the decedent's earnings if the decedent had not been killed, we believe it altogether right and proper that in cases wherein the annual gross income is such that future taxes would have a substantial effect, evidence of the decedent's past and future tax liability should be admitted if a reasonably fair and accurate estimate of his lost future income is to be assured." It is just and logical to admit evidence of, and a corresponding deduction to account for, future income taxes in all cases, subject to the trial court's discretion in Evidence Code section 352 (i.e., whether future income tax evidence would have any appreciable effect on the eventual award). (See generally, *Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 358 [282 P.2d 23, 51 A.L.R.2d 107]; see also, *United States* v. *Sommers* (10th Cir. 1965) 351 F.2d 354, 360.)[3]

The Canavins argue the use of decedent's after-tax income should be rejected because basic fairness should permit claimants to receive a support award greater than their actual lost support to compensate them for attorney fees which will otherwise diminish their net recovery. However, equitable as this may be, fees are a plaintiff's obligation, a cost of doing business not chargeable to the tortfeasor in the absence of statutory or contractual imposition. (Code Civ. Proc., § 1021; *Douglas* v. *Los Angeles Herald-Examiner* (1975) 50 Cal.App.3d 449, 469 [123 Cal.Rptr. 683].) Although it may seem anomalous to deny victims the right to retain 100 percent of their losses incurred solely because of another's negligence, such is the law of

---

[3]"Although many of the courts that have considered the question have rejected evidence of future tax liability, most of the commentators who have carefully analyzed the issue have vigorously disagreed. [Fns. omitted.]" (*Burlington Northern, Inc.* v. *Boxberger, supra,* 529 F.2d 284, 292, fn. 2; see Annot. 63 A.L.R.2d 1393 (1959) and later cases in A.L.R.2d Supp. Service.)

Several jurisdictions have been persuaded by the sound rationale espoused by the vast majority of legal commentators holding that income tax consequences should be considered, including *Furumizo* v. *United States* (D.Hawaii 1965) 245 F.Supp. 981, affd. (9th Cir. 1967) 381 F.2d 965; *United States* v. *English* (9th Cir. 1975) 521 F.2d 63, 71-72; *Burlington Northern, Inc.* v. *Boxberger, supra,* 529 F.2d 284, 287-294; *Felder* v. *United States* (9th Cir. 1976) 543 F.2d 657, 665; *Floyd* v. *Fruit Industries, Inc.* (1957) 144 Conn. 659 [136 A.2d 918, 925-926, 63 A.L.R.2d 1378]; *Runyon* v. *District of Columbia* (D.C.Cir. 1972) 463 F.2d 1319, 1321-1322; *Adams* v. *Deur* (Iowa 1969) 173 N.W.2d 100, 105; *Tenore* v. *Nu Car Carriers, Inc.* (1975) 67 N.J. 466 [341 A.2d 613, 623-629]; *Mosley* v. *United States* (E.D.N.C. 1974) 405 F.Supp. 357, affd. (4th Cir. 1976) 538 F.2d 555; *O'Connor* v. *United States* (2d Cir. 1959) 269 F.2d 578, 584-585; *Nollenberger* v. *United Air Lines, Inc.* (S.D.Cal. 1963) 216 F.Supp. 734; *Brooks* v. *United States* (D.S.C. 1967) 273 F.Supp. 619, 628-632; *Teal* v. *Allstate Ins. Co.* (La.App. 1977) 348 So.2d 83, 86; *Turcotte* v. *Ford Motor Co.* (1st Cir. 1974) 494 F.2d 173, 185; *DeWeese* v. *United States* (10th Cir. 1978) 576 F.2d 802, 808-809 [47 A.L.R.Fed. 723]; *Lewis* v. *Great Western Distributing Co.* (1969) 168 Colo. 424 [451 P.2d 754, 755].

this state (see *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81-82 [137 Cal.Rptr. 863, 562 P.2d 1022]). (See generally *Norfolk & Western R. Co.* v. *Liepelt, supra,* 444 U.S. 490, 494-496 [62 L.Ed.2d 689, 694-695, 100 S.Ct. 755, 758]; *Burlington Northern, Inc.* v. *Boxberger, supra,* 529 F.2d 284, 293-294.)

Failing to reduce decedent's gross earnings by the amount of income taxes the decedent would have paid effectively awards claimants greater financial support than they would have received had decedent lived. This overcompensation has been characterized as punitive. (*Felder* v. *United States, supra,* 543 F.2d 657, 670.) Even jurisdictions refusing to allow jurors to evaluate future lost support based upon decedent's after-tax income do not deny that a more accurate measurement of actual lost benefits is obtained by using after-tax income. Their refusal is based solely upon collateral issues and a lack of faith in the ability of trial courts (and litigants) to present the jury with competent, understandable evidence based upon reasonable predictability. However, evidence of future taxes is no more speculative than other elements from which jurors are asked to predict loss of future earnings within our uncertain society;[4] such as the possibility of death from natural causes, disabling, noncompensable injuries from other causes, the future instability of familial relationships and factors used to determine applicable discount rates by which to reduce the award for future losses to present value. (*Burlington Northern, Inc.* v. *Boxberger, supra,* 529 F.2d 284, 292-293; *Norfolk & Western R.* v. *Liepelt, supra,* 444 U.S. 490, 494-496 [62 L.Ed.2d 689, 694-695, 100 S.Ct. 755, 758]; *Felder* v. *United States, supra,* 543 F.2d 657, 672-674; *United States* v. *English, supra,* 521 F.2d 63, 72.) "As long as our system stays wedded to the single lump sum recovery, our courts simply have to speculate about the uncertainties of the future. With anything as sure as 'death and taxes,' the courts are avoiding their responsibilities when they decline to make the best guess they can, once all the reasonably available evidence has been brought before them." (2 Harper & James, Law of Torts (1956) § 25.12, p. 1327.)

---

[4]In fact, it may be less so. Professor John Maher, in a table showing the ratio of income tax to adjusted gross income for the years 1913 through 1975, shows the federal income tax rate has remained fairly static within narrow bounds from 1941 (the year the income tax rate became a significant factor) through 1975, regardless of war-time or peace-time influences, and remained considerably more stable than inflation. (Maher, *Personal Income Taxes and Claims for Damages* (1978) vol. 50, No. 3, N.Y. State Bar J. 200; see also Nordstrom, *Income Taxes and Personal Injury Awards* (1958) Ohio State L.J. 212, 226-227; Speiser, Recovery for Wrongful Death, Economic Handbook (Cum. Supp. 1982) § 11.8, p. 92.) Thus, the predictability of future income tax rates is not likely beyond the understanding of jurors who daily grapple with tax realities in their personal lives. As stated in *Burlington Northern, Inc.* v. *Boxberger, supra,* 529 F.2d 284, 293, "today's sophisticated jurors surely have had some personal experience in determining their own tax liability, and in today's tax-conscious society we are confident that our juries and judges, with the aid of such competent expert testimony as may be received, are equal to the task and the responsibility."

The Canavins here do not fault PSA's use of after-tax earnings as calling for conjecture or speculation or as likely to confuse the jurors. The jurors were not asked to speculate on the probability or amount of future taxes. At trial, there was no dispute about the amount by which future taxes would reduce decedent's future gross income. The Canavins did not, and do not now, quarrel with the proposition their actual support would have been limited to a percentage of decedent's net spendable take-home pay. Without citing any factual support, they simply claim use of net earnings somehow will always result in undercompensating them for actual lost support.

Where decedent's net earnings after taxes are used to determine future economic loss, undercompensation may be avoided in two ways. First, the trier of fact may be instructed to increase the lump-sum damage award by the amount of income tax payable upon the earnings of the award. (*DeLucca v. United States* (9th Cir. 1982) 670 F.2d 843, 844-845; *Norfolk and Western R. Co. v. Liepelt, supra,* 444 U.S. 490, 494-496 [62 L.Ed.2d 689, 694-695, 100 S.Ct. 755, 758].) Otherwise, failure to adjust the award to reflect the tax burden on the income generated from the award would deprive claimants of the full measure of their award. For, when jurors apply a discount rate based upon the rate of interest earned from investments impairing tax liability on the beneficiaries, payment of those taxes reduces the amount of interest available to reinvest to maintain the level of support required to make claimants whole. This requires an adjustment to compensate for future income tax liability on the investment earnings by increasing the portion of the lump sum award attributable to lost future support.[5]

As summarized in the lead opinion, the second method available to insure claimants' awards are not unfairly reduced is to discount the total amount of future lost support by the smaller factor derived from interest rates generated by tax-free investments. The use of such a rate when relying upon net income after taxes in arriving at lost future earnings approximates the result obtained by using decedent's net income, applying a discount rate based upon a taxable investment and increasing the lump-sum award proportionately to offset the amount of income tax payable on the future earnings generated from investing the award. (See Fitzgerald, *Economic Loss in Wrongful Death: Principles of Evaluation* (July 1977) 44 Insurance Counsel J. 427, 432; see also *DeLucca v. United States, supra,* 670 F.2d 843, 846.) As reflected here, this technique eliminates the need for jurors to speculate on future income tax rates.

---

[5]That allowing the trier of fact to consider future income tax consequences of both decedent and the family beneficiaries in this manner may actually result in a greater overall recovery by the beneficiaries is illustrated in some reported economic projections. (See Brady, Brookshire and Cobb, *Calculating the Effects of Income Taxes on Lost Earnings* (1982) 18 Trial No. 9, 65, 66-68 and Benich, *The Reverse Tax Effect in Wrongful Death or Injury Estimates* (1981) 17 Trial No. 5, 16.)

In summary, because evidence probative of decedent's after-tax earnings is highly relevant and often crucial to a fair, equitable and accurate assessment of damages for lost future support, necessary to avoid the unwarranted, punitive nature of overcompensation, no more difficult for the contemporary, sophisticated jury to comprehend than other economic matters now before it, and no more speculative than other damage elements from which the jury is asked to predict loss of future earnings, such evidence should be admissible subject to the trial court's ordinary discretion. The court properly allowed the jury to receive the evidence here.

A petition for a rehearing was denied November 14, 1983, and the petitions of all parties for a hearing by the Supreme Court were denied January 5, 1984. Bird, C. J., and Mosk, J., were of the opinion that the appellants' petition should be granted.